STATE of Tennessee, Appellee,

v.

Sylvester SMITH, Defendant–Appellant.

Supreme Court of Tennessee.

Oct. 3, 1994.

Rehearing Denied Feb. 21, 1995.

Charles W. Burson, Atty. Gen. and Reporter, Kathy M. Principe, Sr. Counsel, Nashville, for appellee.

W. Mark Ward, Brock Mehler, Nashville, for appellant, on appeal.

## OPINION

DROWOTA, Justice.

The Defendant, Sylvester Smith, appeals directly to this Court his conviction of first-degree felony murder and the sentence of death imposed by the jury. The jury found three aggravating circumstances: (1) the Defendant was previously convicted of one or more felonies which involved the use or threat of violence to the person; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and (3) the murder was committed while the Defendant was engaged in committing a felony. T.C.A. § 39-2-203(i)(2), (5) and (7) (1982). The Defendant raises numer-

ous issues in this appeal; but, after a careful review of the entire record and the law, a majority of the Court affirms the Defendant's guilt and his sentence of death. The verdict and judgment are supported by material evidence, and the sentence of death is in no way arbitrary or disproportionate.

## THE FACTS

The Defendant, Sylvester Smith, was convicted of the felony murder of Olive K. Brewer. Ms. Brewer, an elderly widow, lived by herself in a house on Winchester Road in Memphis, Shelby County. On Sunday, July 2, 1989, Ms. Brewer attended Sunday school and church and had lunch with a friend. Ms. Brewer left the restaurant around 1:30 p.m. and indicated to her friend that she was going to the grocery store before returning home. Ms. Brewer was wearing her diamond ring when she left the restaurant.

That evening, around 8:00, while answering a holdup alarm at a service station, Officer Steve Perry of the Memphis Police Department noticed a vehicle parked in the woods off Winchester next to Ms. Brewer's house. After answering the hold-up call, Perry returned to investigate the vehicle around 8:14 p.m. The automobile, a 1987 Oldsmobile Cutlass, was stuck in the mud. Its engine was still warm. There was evidence someone had been trying to get the car out of the mud. Ms. Brewer's stereo and television were sitting on the ground outside the vehicle. A stereo or television stand was on the front seat of the car.

After learning that the vehicle was registered to the address of the house next door, Perry and another patrolman who had joined him, decided to check Ms. Brewer's residence. It was now about 8:30 p.m. and dusk. They found the back door of the darkened house ajar and the burglar alarm system disarmed. A room to room search of the house led to the discovery of Ms. Brewer's body lying in one and one-half to two inches of bloody water in the bathtub. A blue blanket was over her face, and her dress was pulled up above her hips. Ms. Brewer had

been beaten over her entire body, and her throat had been cut twice. According to the forensic pathologist who testified for the State, either throat wound would have been fatal. The pathologist further stated that drowning had also played a role in her death.

There were large bloodstains at the head and foot of the bed in the front bedroom. Strips of torn sheet and a rope were lying on the floor of the bedroom. One of the strips was bloodsoaked. A used condom containing semen was found in the closet in the bedroom. One of a set of knives in a butcher block in the kitchen had type A human blood on it. The condition of another knife, found on a chair in the living room, prevented its being tested for blood. A grocery sack containing perishable items was sitting on top of a chair next to the door. Police found a crushed metal bucket and a woman's earring lying outside the door. The diamond ring which Ms. Brewer always wore was missing.

Fingerprints on the bathroom sink and on the front hood of the victim's car matched the Defendant's prints. The Defendant's sister, with whom he had lived at the time of the murder, identified the knife found on the chair in the victim's home as resembling a knife she had been missing. The Defendant's thirteen-year-old niece testified that the Defendant had told her that "he cut this lady's throat and put her in a bathtub full of water." She said that the Defendant had threatened to cut her throat if she told this to anyone.

Shortly after the murder, the Defendant had approached Willie Cox, an acquaintance, and asked if he would like to buy a lady's diamond ring and three necklaces from him. When Cox asked the Defendant where he had gotten the ring, the Defendant told him it had come "out of the lady's house on Winchester." The Defendant told Cox he had killed the woman because "he don't leave no witnesses." The Defendant said he had cut her throat, tied her hands and put her in the bathtub. The Defendant also told Cox that he had put an electric appliance in the tub with her.

When the Defendant was questioned about the murder a year later, in July of 1990, he denied any knowledge of the murder, denied knowing the victim, and denied ever being in her house. When confronted with the evidence of his fingerprints, he denied they were his.

At the guilt phase the Defendant did not testify, nor did he offer any evidence.

At the sentencing hearing, the State introduced proof that the Defendant had been previously convicted of robbery with a deadly weapon in January 1972, receiving a thirty-five-year sentence; of assault with intent to commit first-degree murder in April 1972; and of aggravated rape in May 1991, receiving a forty-year year sentence. The State also presented photographs depicting numerous bruises and the fatal wounds on the victim's body. The pathologist testified that the victim would have been alive at the time that the water entered her lungs and that she could have lived hours after her throat was cut. Either the slash wounds to her throat or the drowning, in and of themselves, would have been sufficient to have produced death.

The defense introduced the testimony of a clinical psychologist who testified that the Defendant had tested at an IQ of 54 on the Stanford–Binet Intelligence Scale administered by him in May 1991. School records showed that in the third grade the Defendant tested at an IQ of 72, and of 67 in the fifth grade. A Beta IQ test was given to the Defendant by the Department of Corrections in 1966. The validity of this test showing an IQ of 88 was questioned by the psychologist. A parole evaluation described Defendant as having mild to moderate impairment in intellectual function. The psychologist testified that the Defendant would be classified as mentally retarded, that the Defendant's intellectual capacity was diminished, and that this impairment was a mental defect.

## SUFFICIENCY OF THE EVIDENCE

We first address Defendant's contention that the evidence is insufficient to

support the finding of guilt and the finding of the heinous, atrocious and cruel aggravating factor. The principles which govern our review of a conviction by a jury are well settled. A jury verdict approved by the trial judge accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn.1983). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn.1978). A verdict against the Defendant removes the presumption of innocence and raises the presumption of guilt on appeal, *see State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973), which the Defendant has the burden of overcoming. *State v. Brown*, 551 S.W.2d 329, 331 (Tenn.1977). Where the sufficiency of the convicting evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found Defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Duncan*, 698 S.W.2d 63 (Tenn.1985); T.R.A.P. 13(e).

The Defendant's identity was established by his fingerprints found in the victim's home and on the front hood of her car, which was stuck in the mud and contained items taken from the victim's home. There was no explanation by the Defendant as to how his fingerprints could have gotten in Ms. Brewer's home and on her car. The Defendant maintained in a statement to the police that he did not know the victim and had never been in her home. This, taken in conjunction with the Defendant's statements to his niece and to Willie Cox indicating that he had committed the murder, clearly established his guilt.

The evidence indisputably supports aggravating circumstances (i)(2) [the Defen-

dant was previously convicted of one or more felonies which involved the use or threat of violence to the person] and (i)(7) [the murder was committed while the Defendant was engaged in committing a robbery]. The Defendant argues that the evidence was insufficient to support (i)(5) [the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind]. The evidence shows that in the course of robbing the victim, an elderly woman, the Defendant brutally beat her about her entire body, tied her up, slashed her throat and drowned her in the bathtub while she was still conscious.

The Defendant avers that the evidence is insufficient to support a finding of torture because the pathologist testified only that the victim "could have been conscious during her ordeal." The jury could have inferred from this testimony and from the use of the sheets to tie the victim and the posture of her body in the bathtub that the victim was alive and conscious during her rape and the beating, slashing and drowning. This meets the definition of torture in *State v. Williams*, 690 S.W.2d 517, 529 (Tenn.1985). Furthermore, such mistreatment of an unconscious or deceased person so close to the time of the victim's death could also establish "depravity of mind" at the time of the killing under *Williams*.[1] It was for the jury to determine whether the proof established that the victim was tortured prior to her death or that Defendant's acts involved depravity of mind. The jury resolved this factual question in favor of the State and against the Defendant. This issue is without merit.

Having found the evidence sufficient to support the finding of the "heinous, atrocious or cruel in that it involved torture or depravity of mind" aggravating circumstance, we now turn to Defendant's argument that the "depravity of mind" aspect of subsection (i)(5) is unconstitutionally vague. This Court recently rejected this argument in *State v. Cazes*, 875 S.W.2d 253 (Tenn.1994), and *State v. Black*, 815 S.W.2d 166, 181 (Tenn.1991).

---

1. For a more detailed discussion of "depravity of mind," see this Court's recent decision in *State v.*

*Van Tran*, 864 S.W.2d 465 (Tenn.1993).

*See also, State v. Van Tran,* 864 S.W.2d 465, 478–480 (Tenn.1993). Even were we to agree with Defendant's contentions in this respect, we note that this aggravating circumstance does not depend upon a finding of depravity in the present case but is independently established by the element of torture.

## PROSPECTIVE JUROR'S REMARK DURING VOIR DIRE

■ During voir dire a prospective juror, when asked if he had any beliefs that would prevent his considering the death penalty in a proper case, replied, "When it comes down to the death penalty itself, giving, I'm not really going to worry about it because I look at it farther down the line. May be going too far. Counsel is going to appeal, so it will be a long time before the man even approach that." Shortly thereafter, the trial court instructed all the prospective jurors present to "disregard all remarks that [the juror] made" and told them not to consider anything that would occur after the trial in making their determination in this case. The prospective jurors indicated they would.

The Defendant argues that the prospective juror's remark "infected the entire jury panel" and diminished the jury's collective sense of responsibility for imposing a death sentence in violation of *Caldwell v. Mississippi, infra. Caldwell* does not require reversal. It involved argument by the State, approved by the trial judge, informing the jury that its decision was not final. We find that any potential prejudice here was avoided by the trial court's curative instruction, which the jury is presumed to have followed. *State v. Baker,* 751 S.W.2d 154, 164 (Tenn.Crim.App. 1987).

## SELECTION OF THE JURY

### A.

The Defendant avers that the jury was selected in a racially discriminatory manner because the State exercised its peremptory challenges in a discriminatory manner. In the present case the Defendant was black and the victim was white. When the first five peremptory challenges exercised by the State were used to excuse five black prospective jurors, the Defendant raised this issue pursuant to *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The State explained its use of peremptory challenges by stating that each prospective juror had expressed reservations against the death penalty. The State also enumerated separate reasons for excusing each venire-member that were not based on the venire-member's race. The trial court then overruled the *Batson* objection.

■ On appeal the Defendant challenges only the State's use of a peremptory challenge as to a single prospective juror. As its reason for excusing the juror, the State said that he had been hostile to the prosecutor, argued with him, was evasive and was opposed to the death penalty. The Defendant argues that the record fails to support the prosecution's explanations and asserts a violation of equal protection for striking this one venire-member for racial reasons. *See State v. Ellison,* 841 S.W.2d 824, 827 (Tenn.1992).

■ From a reading of a cold record it is difficult to determine whether the prospective juror's answers to the prosecutor were hostile or argumentative. However, the juror's hostility and contentiousness is indicated by the fact that he often responded to the prosecutor's questions with his own questions. In any event, determination of the prosecutor's discriminatory intent or lack thereof turns largely on the evaluation of the prosecutor's credibility, of which the attorney's demeanor is often the best evidence. *State v. Ellison,* 841 S.W.2d at 827. A trial court's finding of intentional discrimination is entitled to "appropriate deference by a reviewing court." *Batson v. Kentucky,* 476 U.S. at 98, n. 21, 106 S.Ct. at 1724, n. 21; *see also Hernandez v. New York,* 500 U.S. 352, 365–69, 111 S.Ct. 1859, 1869–1871, 114 L.Ed.2d 395 (1991). The Defendant has not demonstrated error in the court's accrediting the State's racially neutral reasons for excusing the prospective juror.

### B.

■ The Defendant next asserts that the procedure employed by the trial court to

select the twelve prospective jurors seated in the box was used arbitrarily to exclude members of Appellant's own race, thereby violating the equal protection clause of the Fourteenth Amendment. Defendant complains that at one point during voir dire, after exercise of peremptory challenges left a vacant seat in the box, the trial judge ordered Ms. Ervin, one of six prospective jurors not in the box, to replace a challenged juror out of sequence. Allegedly, three other prospective jurors' names had been called before hers. Defense counsel objected to Ms. Ervin being seated because two of the three jurors not called were black. The State noted for the record that the third juror was white and "they're all randomly chosen." Defendant asserts that, in addition to violating the Fourteenth Amendment, the court's arbitrarily choosing which juror should replace one removed from the box violates Rule 24, Tenn.R.Crim.P.

The State contends the issue is waived because the Defendant failed to exercise all his peremptory challenges and because any error is harmless unless the Defendant can establish that a juror who heard the case was not impartial. The State also alleges that the three prospective jurors passed over were eventually called to the box. The Defendant's challenge appears not to be directed at the jury composition as much as at the procedure used to seat the jury. There is nothing in the record to indicate Ms. Ervin was chosen for a racially discriminatory reason. We find no merit in this issue.

### C.

■ The Defendant next avers that the trial court erred in denying Defendant's challenge for cause of prospective juror Griggs. The State asserts that the Defendant had peremptory challenges left and therefore cannot be heard to complain about the court's overruling his challenge. *See Ross v. Oklahoma,* 487 U.S. 81, 89–90, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80, 91 (1988); *State v. Jones,* 789 S.W.2d 545, 549 (Tenn.1990).

The record reveals that Griggs had stopped working for the Shelby County Sher-

iff's Department Rescue Squad two months before the trial began and had seen numerous crime scenes. The Defendant moved that Griggs be excused for cause because he indicated that his past experiences might have some bearing on his decision in the case, although he hoped this would not happen. Defendant asserts the court's failure to excuse Griggs violates his right to an impartial jury under the state and federal constitutions. Our review of Griggs' voir dire reveals that he was concerned that the evidence in this case might trigger his memories of other crime scenes and that he might "hold a prejudice against somebody that's accused of a crime like that." Griggs, however, unequivocally stated that he would try not to let his feelings get involved and would base any decision in the case solely on the evidence and law and would set aside anything he knew from past experiences. It was also clear that Griggs had no knowledge of this case from his work with the rescue squad. We find the trial judge did not abuse his discretion in refusing to excuse Griggs for cause.

### D.

■ The Defendant contends that the trial court erred in excusing prospective juror Albert Grady for cause. The Defendant avers that Grady's excusal for cause did not meet the test for exclusion set out in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Grady indicated that he automatically could not vote to impose the death penalty in any case because of his religious beliefs. Some of his answers, however, were equivocal. He indicated at one point he "believed" the prosecutor was correct when the prosecutor stated that Grady's belief was such that he "absolutely would not consider the death penalty in a particular case." Later, when he was asked by the court whether he would automatically refuse to consider the death penalty, Grady's answer was tentative. We find Grady's excusal meets the test of *Wainwright v. Witt.* Under the present record the Defendant has not established that the trial court erred in ex-

cusing prospective juror Grady for cause because his views on the death penalty would prevent or substantially impair his performance of his duties as a juror in accordance with his instructions and his oath. *See State v. Alley*, 776 S.W.2d 506, 518 (Tenn.1989).

## MENTAL RETARDATION

The Defendant avers the trial court erred by denying his motion to preclude the death penalty on the grounds that he is mentally retarded. T.C.A. § 39–13–203(b) provides that no defendant with mental retardation at the time of committing first-degree murder shall be sentenced to death. As used in the statute, "mental retardation" means:

(1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligent quotient (I.Q.) of seventy (70) or below;

(2) Deficits in adaptive behavior; and

(3) The mental retardation must have been manifested during the developmental period, or by the age of eighteen (18).

T.C.A. § 39–13–203(a). The burden of production and persuasion to demonstrate mental retardation by a preponderance of the evidence is upon the Defendant. The trial court shall make the determination of whether the Defendant was mentally retarded at the time of committing first-degree murder. T.C.A. § 39–13–203(c).

▮▮▮ On the day this case was set in the trial court, the Defendant orally moved that the State not be allowed to seek the death penalty because the Defendant was mentally retarded under § 39–13–203.[2] A hearing was conducted on the Defendant's motion the following day. Dr. John Robert Hutson, a clinical psychologist since 1975, testified for the defense that he did an intellectual evaluation of the Defendant and that the Defendant had registered an I.Q. of 54 on the Stanford–

Binet Intelligence Scale. The Defendant also presented the Defendant's school records, through a coordinator for attendance, which showed that he had received an I.Q. score of 72 in 1957, when in the third grade, and an I.Q. score of 67 in 1960, when in the 5th grade. The Defendant's date of birth was March 8, 1948; therefore, he would have been nine and twelve respectively at the time of these tests.

The State presented letters written by the Defendant while on parole and in prison and introduced records from the Department of Correction indicating a Beta I.Q. of 88 for the Defendant in 1966, when he was 18 years old. A mental health screening test from 1985 indicated that Defendant's "judgment and insight were within normal limits for this population." A second evaluation in May 1986, when the Defendant was 38 years old, contained remarks that Defendant's MMPI (Minnesota Multi–Phasic Personality Inventory) was invalid because of Defendant's "random and essentially meaningless" responses. It was reported that the Defendant stated that he did not understand many of the terms used in the MMPI questions. Another test "suggested somewhat impaired intellectual skills." The evaluation continued, "[T]he subject suggests one of mild to moderate impairment. It seems he does not have very sophisticated intellectual skills; thus, his level of processing is rather superficial." The conclusion stated, "It seems he is of mildly impaired intellectual functioning." At the same time, the report stated that the Defendant could "maintain a fair amount of control" and that his judgment and assessment of reality were within normal limits for the population.

Dr. Hutson was recalled and testified in rebuttal that the Beta test was not a reliable diagnostic tool or valid I.Q. test but a screening device for classification in jails.

The trial judge found that the defense had failed "to carry the burden of proof in this

---

**2.** Neither the statute itself nor any other statute or law expressly sets forth any procedure for raising the issue of mental retardation under § 39–2–203. We are of the opinion that it would be preferable for the Defendant to raise the issue by a written pretrial motion to allow the State time to marshal its evidence and to assure the trial court's determination is the result of a fair and thorough presentation of all evidence relevant to this issue.

case, which is by the preponderance of the evidence." The court interpreted the evidence as indicating the Defendant "may be functionally low in intelligence" but found that he was not mentally retarded under the standards of § 39–13–203.

The Defendant first avers that the court applied erroneous legal and medical standards. The Defendant also avers that the trial court improperly relied upon evidence of Defendant's ability to function in prison in determining Defendant's deficits in adaptive behavior. Defendant's second argument is that the evidence presented at the hearing preponderates against the trial court's findings.

■ T.C.A. § 39–13–203 contains no standards for evaluating the evidence offered to establish or disprove "mental retardation." Furthermore, the statute does not define the phrase "deficits in adaptive behavior." The Defendant would have the court adopt the standards and definitions of the manual of the American Association on Mental Retardation entitled *Classification in Mental Retardation* (1983), which is cited for the first time in this proceeding in Defendant's appellate brief. The State argues that the manual is not properly in evidence and that the Court may not take judicial notice of it. Nothing from the manual was introduced in the trial court. The manual is not admissible under Tenn.R.Evid. 202 or 618. An appellate court may not permit the introduction of evidence in the first instance.

■ Customary rules of statutory construction also persuade us against considering the definitions and standards proposed by the Defendant. The issue of whether the Defendant is "mentally retarded" is controlled by the law as set forth by the General Assembly in T.C.A. § 39–13–203. In applying and construing this, or any other statute, the Court's primary object is to determine the legislative intent. In doing so, we look first to the statute itself and rely, when possible, upon the ordinary meaning of the language and terms used, refraining from

any forced or subtle construction to limit or extend the statute's meaning. *State v. Doe,* 588 S.W.2d 549, 551 (Tenn.1979); *Ellenburg v. State,* 215 Tenn. 153, 384 S.W.2d 29, 30 (1964). It would be expected that the General Assembly would have included a definition of the term "deficits in adaptive behavior" or referred to those materials in which a definition or standards could be found if it had meant for this term, or the statute as a whole, to have been interpreted in a way other than its ordinary meaning. In the absence of legislative intention otherwise, we decline to place a technical gloss upon these words or the statute itself.

■ Examining the trial court's actions without attributing any technical meanings to the statutory language, one sees that the trial court applied the statute according to its terms as they might generally be understood. Whether the Defendant was "mentally retarded" under the definition in the statute was a matter for the trial court. The State argues that the Defendant failed to establish that mental retardation had been manifested in the Defendant by age eighteen (18) as required by subsection (a)(3). More cogently, the State also argues that the Defendant failed to offer any proof as to the second prong required under subsection (a)(2) of the statute: "deficits in adaptive behavior."

■ The State points out that despite Defendant's low I.Q. score, he studied for, took, and passed his G.E.D. while serving time in prison on other convictions. Additionally, while in prison, he worked various jobs. One of those jobs was as a clerk assigned to the kitchen. That job included inventorying supplies, ordering supplies, and other associated clerical duties. The State avers that not only did the Defendant fail to carry his burden of demonstrating that he suffered deficits in his adaptive behavior but points out that the State put on proof that the Defendant functioned quite well, was able to hold down a job in prison and took an exam which would indicate that he had learned to adapt quite well to his low I.Q.

The Defendant responds that the Defendant was the fourth of five children born out

of wedlock, that there was no father figure in the home and that subsistence was provided by the Welfare Department. Asserting that these factors impede development and impair adaptive behavior, that the Defendant's I.Q. was 67 in the fifth grade, and that he had never been able to live independently in the community or abide by community standards, the Defendant avers that the conclusion that the Defendant was and is mentally retarded is amply supported.

A statutory definition for the term "deficits in adaptive behavior" would aid both the trial court and appellate review. Lacking such definition, however, we construe the term in its ordinary sense, to mean the inability of an individual to behave so as to adapt to surrounding circumstances. It is regrettable that Dr. Hutson, the only clinician to evaluate the Defendant and to testify, did not discuss the adaptive deficit prong. Dr. Hutson's evaluation of the Defendant was limited to ascertaining the level of his intellectual functioning based on the administration of one test. The record is inadequate to support a finding that the Defendant suffers deficits in his adaptive behavior. We find the trial court did not err in holding that the Defendant failed to sustain his burden of proof to show that, at the time of the offense, he was "mentally retarded" under the criteria of T.C.A. § 39–13–203.

## THE FLIGHT INSTRUCTION

The Defendant next avers that the trial court erred in instructing the jury on flight at the guilt phase. The State argues that this issue is waived because it was not raised in the Defendant's motion for a new trial. The trial judge charged the jury on flight at the guilt phase. On appeal the Defendant asserts that the charge was improper under the facts of this case, where "the only evidence concerning this issue was that [he] left the scene and his identity was not discovered for one year." There was, however, circumstantial evidence of immediate flight. Officer Perry stated that he first noticed the victim's car in the woods as he drove by in his patrol car at a high rate of speed answering an alarm at another address

north of Winchester Road. When he returned approximately fifteen minutes later, the victim's car was still warm. One could infer that the Defendant was at the car, saw Officer Perry when he drove by with his blue lights and siren on, and left the scene at that time because of fear of apprehension. Furthermore, there is evidence that the Defendant concealed himself in the community. *See Rogers v. State,* 2 Tenn.Crim.App. 491, 455 S.W.2d 182, 187 (Tenn.Crim.App.1970).

Even if an instruction on flight should not have been given, any error is not reversible. The Court instructed the jury that whether the Defendant fled was a question solely for their decision, that they need not infer flight, and that flight alone was insufficient to prove guilt. This, coupled with the overwhelming proof of Defendant's guilt, renders any error as to the flight instruction harmless.

## ERRORS IN THE PENALTY PHASE

The Defendant objects to several aspects of the jury charge given at the close of the penalty phase. The State responds that the Defendant has waived any objection to these complaints by failing to make a contemporaneous objection and failing to raise the issue in his motion for a new trial. The State further maintains that no error occurred. The Defendant submits that the trial judge's failure to instruct the jury in conformity to the new statute was a "fundamental error" which should be recognized in the context of a death penalty case, despite the fact that there was no objection or special request. The State maintains that if there was error, it was not of a constitutional nature and further did not constitute "fundamental error." Similar arguments were made by the State in *State v. Brimmer,* 876 S.W.2d 75 (Tenn.1994) and *State v. Cazes,* 875 S.W.2d 253 (Tenn.1994). In *Brimmer,* we held that "[u]nder these circumstances we exercise our discretion to review this issue in order to insure substantial justice is done. *See* Tenn. R.Crim.P. 52(b)." 876 S.W.2d at 82.

### A.

### THE APPLICABILITY OF THE 1989 AMENDMENT

The Defendant avers that the trial judge committed error because he should have

charged the jury under the November 1989 amendment to the Tennessee death penalty statute since the trial and sentencing hearing occurred after that date. The offense occurred in July 1989. The capital sentencing statute was amended November 1, 1989. The Defendant was tried and sentenced in September 1991. The trial court instructed the jury under the capital sentencing statute as it existed prior to November 1, 1989. The changes in the 1989 Act involved in this case include the instructions regarding the burden of proof, the standard of proof and the weighing of aggravating and mitigating circumstances, and the definition of the "heinous, atrocious, or cruel" aggravating circumstance. The issue thus presented is whether the General Assembly intended that the 1989 amendments to the capital sentencing statute apply to sentencing conducted after the effective date of the amendments for capital offenses committed before the effective date.

■ Generally, a criminal offender must be sentenced pursuant to the statute in effect at the time of the offense. *See State v. Reed,* 689 S.W.2d 190, 196 (Tenn.Crim.App.1984); 24 C.J.S. *Criminal Law,* § 1462 (1989). The Defendant, however, relies upon T.C.A. § 40–35–117(b) which provides:

> Unless prohibited by the United States or Tennessee Constitution, any person sentenced on or after November 1, 1989, for an offense committed between July 1, 1982 and November 1, 1989, shall be sentenced under the provisions of this chapter.

The State submits that the statute's reference to "this chapter" refers to the Criminal Sentencing Reform Act of 1989 (Title 40, Chapter 35) and not to T.C.A. § 39–13–204, *et seq.,* (Title 39, Chapter 13), which governs sentencing in capital cases. In the public act, the Legislature used the word "act" in place of "chapter," which is found in the codification of the public act. 1989 Pub. Act. No. 591. The term "act" in the public chapter clearly refers only to the Criminal Sentencing Reform Act.

■ The State further argues that T.C.A. § 40–35–117 does not govern the issue of whether the changes in the capital sentencing statute apply to those persons who committed their offense prior to November 1, 1989, but were sentenced after that date. Rather, the controlling provision is T.C.A. § 39–11–112, which provides:

> Whenever any penal statute or penal legislative act of the State is repealed or amended by a subsequent legislative act, any offense is defined by the statute or act being repealed or amended, committed while such statute or act was in full force and effect shall be prosecuted under the act or statute at the time of the commission of the offense. Except as provided under the provisions of § 40–35–117, in the event the subsequent act provides for a lesser penalty, any punishment imposed shall be in accordance with the subsequent act.

The State argues that in determining whether the old or new statute applies, the question becomes whether the subsequent act provides for a lesser penalty. In this case, the punishment prior to November 1, 1989, for first-degree murder was either life or death. The punishment after the amendments to the Act did not affect the penalty: it remains either life or death. It cannot be said that a lesser penalty was provided by the subsequent act. Rather, the subsequent act merely changed various procedures to be followed at the sentencing hearing. We find it difficult to say that the amendments to the capital sentencing statute "provide for a lesser penalty" since the amendments mandate no specific result but change only the method by which the jury should reach its decision.

Faced with the same question in *State v. Brimmer, supra,* we found controlling the general provisions of T.C.A. § 39–11–112 and the principles against retroactive application of statutes. We held the trial court correctly instructed the sentencing law in effect at the time the murder was committed. Likewise, in *State v. Cazes, supra,* where the offense occurred prior to the amendment, we found the jury instruction under the pre–1989 statute was appropriate. We accordingly find no error in the present case.

## B.

The Defendant next argues that the trial court erred in charging T.C.A. § 39–2–203(g) (1982), which required only that the jury find there were no mitigating circumstances sufficiently substantial to outweigh any statutory aggravating circumstances proved beyond a reasonable doubt by the State. Under the new statute, T.C.A. § 39–13–204(g) (1991), the jury would have been instructed that, to impose the death penalty, it must find that the aggravating circumstances proven by the State outweighed, beyond a reasonable doubt, any mitigating circumstances before the jury may impose a sentence of death. We have found the 1989 amendments do not apply.

The Defendant also argues that the instructions under the prior law (1) omitting the reasonable doubt standard and (2) requiring mitigating circumstances to outweigh statutory aggravating circumstances are unconstitutional whether or not the 1989 amendments apply. These arguments have been rejected by this Court. *See, e.g. State v. Black*, 815 S.W.2d 166, 185 (Tenn.1991); *State v. Payne*, 791 S.W.2d 10, 20–21 (Tenn. 1990); *State v. Thompson*, 768 S.W.2d 239, 251–252 (Tenn.1989).

## C.

The Defendant next alleges that the new language in T.C.A. § 39–13–204(i)(5) deleting "depravity of mind" and requiring in its place "physical abuse beyond that necessary to produce death" should have been instructed. The trial judge was not in error in charging the aggravating circumstance as it was written at the time of the offense. We note, however, that in this case the evidence supports a finding of either depravity of mind or physical abuse beyond that necessary to produce death.

## D.

The Defendant next argues that the trial court should have charged the "catch-all" mitigating circumstance contained in the new statute at § 39–13–204(j)(9), which reads as follows:

(9) Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing.

As pointed out above, the new statute does not apply. Furthermore, the instructions given by the trial court in this case conveyed the substance of the new section of the statute.

## E.

The Defendant next argues that the trial court's failure to define or explain the concept of mitigating circumstances for the jury created a reasonable likelihood the jury would not have considered his evidence of mental retardation and diminished intellectual capacity. This issue was recently raised in *State v. Brimmer*, supra, (Tenn.1994) and *State v. Cazes, supra*, and found to be without merit.

## F.

The Defendant next avers that the qualifiers "extreme" and "substantially" used in statutory mitigating circumstances § 39–13–204(j)(2) and (j)(8) unconstitutionally limit the sentencer's consideration of mitigating circumstances of mental or emotional disturbance or mental impairment falling below this standard and thereby preclude the jury's consideration of evidence of Defendant's mental and intellectual problems. This argument was recently rejected in *State v. Smith*, 857 S.W.2d 1 (Tenn.1993), and *State v. Cazes*, *supra*.

## G.

The Defendant contends that he was prejudiced by the failure of the trial court to completely obscure the text of the statutory mitigating circumstances inapplicable to the case that were listed in the written jury charge form. The trial judge drew several lines through the text but did not completely mark it out. He instructed only the two

statutory aggravating circumstances applicable to this case. It appears that defense counsel agreed to the court's "striking out" inapplicable mitigating circumstances listed and did not complain of the manner in which it was done. Even where the court erroneously charges all statutory mitigating circumstances, in the absence of a showing of prejudice, this error does not require reversal. *State v. Teel,* 793 S.W.2d 236, 252 (Tenn. 1990); *State v. Carter,* 714 S.W.2d 241, 251 (Tenn.1986). We find no error in the trial court's actions.

## H.

■ The Defendant next alleges that the trial court erred (1) in refusing to charge the Defendant's special request that the jury "may consider sympathy, based upon the evidence presented, in determining whether to sentence the Defendant to life imprisonment or death" and (2) in charging only that the jury should not "allow mere sympathy or prejudice to influence their verdict." Defendant avers that the combination of the failure to charge regarding sympathy and the giving of the "anti-sympathy" charge created a reasonable likelihood that the jury felt it could not consider sympathy elicited by Defendant's mental impairment. A trial judge does not err in instructing a jury not to allow mere sympathy or prejudice to influence them in reaching their verdict. *State v. Cazes,* 875 S.W.2d 253, 268 (Tenn.1994); *State v. Harris,* 839 S.W.2d 54, 75 (Tenn. 1992); *State v. Boyd,* 797 S.W.2d 589, 598 (Tenn.1990); *State v. Porterfield,* 746 S.W.2d 441, 450 (Tenn.1988).

## I.

■ The Defendant next avers that a comment to the jury by the trial court during its brief explanation of why it had marked out certain mitigating circumstances listed in the written charge confused and misled the jury to believe that the Defendant was relying only on the two statutory mitigating circumstances and not the general "catch-all" category, which embraced his evidence of

mental impairment. After the bench conference at which mitigating circumstances inapplicable to the present case were stricken from the charge, the court told the jury it had "just stricken out a number of items, and this was with consultation and agreement of the defense counsel that they are really relying on only three items of mitigation." The charge given informed the jury that they were to consider any favorable evidence of the Defendant's record or character or circumstances of the crime they found and were not limited to the statutory mitigating circumstances. We find that there is no reasonable likelihood under this charge that the jury would interpret the court's informal remarks made prior to the charge as precluding their consideration of mitigating circumstances not expressly listed in the statute. *See Boyde v. California,* 494 U.S. 370, 380–81, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990).

## J.

The Defendant also contends that statements to prospective jurors during voir dire describing the weighing process for determining the sentence under the standards of the prior sentencing statute was reversible error. During the voir dire, both the prosecutor and the court described the sentencing procedure for prospective jurors in the language of the sentencing statute prior to its amendment in 1989 and spoke of the determination as being whether mitigating circumstances outweigh aggravating circumstances. This issue raises again the question of what law applies. We have held the old law applies; therefore, there was no error in the description.

## TRIAL COURT LIMITED THE DEFENDANT'S RIGHT TO PRESENT MITIGATING EVIDENCE

■ During the penalty stage of the trial, the Defendant presented the testimony of Dr. John Hutson, a clinical psychologist, who was an expert in the field of forensic psychology. The Defendant alleges that the court's

sustaining the State's objections to Dr. Hutson's testimony that the Beta IQ test was not a valid tool for measuring IQ and not allowing the doctor to explain this opinion violated Defendant's right to present mitigating evidence under the Eighth and Fourteenth Amendments to the Federal Constitution and Article I, Sections 8 and 16, of the Tennessee Constitution. At the sentencing phase, after testifying about Defendant's scores on the intelligence test recently administered to him in May 1991 and on the tests taken during grade school, Dr. Hutson was asked if he had found any kind of IQ score in Defendant's records from the Department of Corrections. Dr. Hutson testified that Defendant had received an 88 score on a Beta IQ in 1966. As Dr. Hutson, asked to explain the Beta IQ, began to testify about the test's development and its invalidity as a measure of intelligence, the State objected several times. The trial court sustained the objections and denied Defendant's request to make an offer of proof. At a jury-out hearing it became apparent the State felt that this line of questioning was improper as an attempt by Defendant to impeach his own witness and that this inquiry should be allowed only on redirect after the State had brought out the Beta IQ evaluation.

The reason expressed by the trial judge for sustaining the State's objections is not clear. The court seems to have erroneously felt that the legal issue of mental retardation had been decided by his earlier pre-trial decision and that Dr. Hutson's testimony that the Beta IQ was invalid was enough proof on this issue. After the jury returned, Dr. Hutson testified that the two IQ tests most commonly used were the Wechsler and Stanford–Binet. This question and his answer implied that these two were valid IQ tests in comparison with the Beta IQ test.

In a capital sentencing hearing, evidence may be presented as to any matter the Court deems relevant to the punishment, including the Defendant's character, background history, and physical condition, and any matter relevant to establish or rebut any mitigating factors. T.C.A. § 39–13–204(c). *See also*

*Zant v. Stephens*, 462 U.S. 862, 884–85, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983) (evidence is admissible at capital sentencing so long as it is relevant, reliable and not prejudicial); *Gregg v. Georgia*, 428 U.S. 153, 202–03, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976) ("[i]t is desirable for the jury to have as much information before it as possible when it makes the sentencing decision"). The Defendant's score on the Beta IQ and Dr. Hutson's opinions about the test were relevant to sentencing.

The United States Supreme Court held in *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), that exclusion of relevant mitigating evidence from a sentencing hearing violates the Eighth Amendment. In the present case, however, any error is harmless beyond a reasonable doubt because, by asking about the intelligence tests Dr. Hutson considered "valid," the Defendant presented this mitigating factor to the jury.

## PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT

The State points out that Defendant made no contemporaneous objection to the allegedly improper argument and did not raise this issue on motion for a new trial. Ordinarily, this inaction would result in waiver of the issue. *See* T.R.A.P. 3(e); *State v. Pritchett*, 621 S.W.2d 127, 135 (Tenn.1980).

■ Defendant's first contention is that, when it characterized Defendant's mitigating evidence as an "excuse" and argued that the sentencing hearing was about "responsibility," the prosecution violated the Eighth and Fourteenth Amendments to the United States Constitution and Article 1, Sections 8 and 16 of the Tennessee Constitution by denigrating Defendant's mitigation evidence and distorting its application to such an extent as to undermine the reliability of the sentencing determination. We find nothing wrong with counsel's argument. Taken in context, the argument does not distort the evidence or mislead the jury as to the issue before it.

The Defendant next contends that the State's closing argument violated the principles of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), by diminishing the jury's sense of responsibility in imposing death. The Defendant cites a portion of argument in which the prosecutor told the jury that, contrary to what had been stated by Defendant, "the State of Tennessee ... is not asking you to put Sylvester Smith to death. That's a miss—that's a misterm.—They're not asking you to do anything...." The argument which immediately followed described the serious role the jury played in sentencing and emphasized their responsibility as sentencer. The State did not indicate in any way that the jury was not the final decision maker in this case. We find no error.

## DEFENDANT'S MOTION FOR MISTRIAL

The Defendant next alleges that the trial court erred in refusing to grant a mistrial when a witness revealed that the Defendant had previously served time in jail. This incident occurred during the guilt phase of the trial, when the Defendant's sister, asked by the State how long the Defendant had been living with her in 1989, answered, "Well—well, he hadn't been too long got out of jail, so about a year." The Defendant's motion for a mistrial because of this remark was denied. The trial court, however, gave a curative instruction to disregard the question and the witness's answer and told the jury not to consider the statement for any purpose.

Although we find the witness's statement was improper, it was unresponsive and unsolicited. We must assume that the jury followed the court's curative instruction. *See State v. Baker, supra,* 751 S.W.2d at 164. Moreover, considering the overwhelming proof of Defendant's guilt and the fact that his prior record was legitimately before the jury at sentencing, we find this brief statement could not have prejudicially affected the jury either as to sentence or guilt. T.R.A.P. 36(b). The court did not commit reversible error in denying Defendant's motion for mistrial. *See State v. Lawson,* 695 S.W.2d 202, 204 (Tenn.Crim.App.1985).

## REFUSAL TO ALLOW CROSS-EXAMINATION

The Defendant next argues that the trial court erred in refusing to allow cross-examination of Willie Cox about "his deal" with the State. Willie Cox testified that the Defendant had told him shortly after the murder that the Defendant had cut the throat of a woman on Winchester and put her in a bathtub. Cox, who, it was revealed, had several prior convictions, had not come forward with this information until a year later when he himself was "in trouble" once again. On cross-examination, the Defendant asked Cox if he had been trying to make "a deal." Cox replied, "No, it wasn't really a deal" but he thought it might be a deal. The defense then elicited that Cox had pleaded guilty to voluntary manslaughter and served six months in jail. The court sustained the State's objection to Defendant's elicitation of how much time Cox had served and to a second question proposing to "ask [Cox] something about [his] voluntary manslaughter charge." The State had argued that this information was irrelevant. The Court also sustained an objection to a later question on re-cross in which the Defendant asked if, at the time of his statement to police, was Cox not "really charged with murder in the second degree." The Defendant contends that the court's rulings on the State's objections prevented his examining Cox to show that promises of leniency had motivated Cox to testify falsely against the Defendant and that this limitation on cross-examination interfered with his Sixth Amendment right of confrontation.

The State argues that the Defendant waived this issue by not making an offer of proof to establish there was a deal. *See* Tenn.R.Evid. 103(a)(2) (error may not be predicated on an error excluding evidence unless the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context). As the

924

State points out, Cox denied there was a deal. This issue also was not raised on motion for new trial.

■ An accused has a right to explore on cross-examination promises of leniency to a prosecution witness to show a motive for testifying falsely for the State. *State v. Norris,* 684 S.W.2d 650, 654 (Tenn.Crim.App. 1984). Undue restriction of this right may violate a defendant's right to confrontation. *See Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). *See generally,* Cohen, Paine and Sheppeard, *Tennessee Law of Evidence,* § 616.3 (2nd ed. 1990). In the present case, if the voluntary manslaughter conviction did grow out of the "trouble" Cox was in when he contacted the authorities, and this is not entirely clear from the record, the trial court should have allowed inquiry into Cox's treatment by the State on this conviction. Any error, however, is harmless beyond a reasonable doubt. *See State v. Black,* 815 S.W.2d 166, 177 (Tenn.1991); *Delaware v. Van Arsdall,* 475 U.S. at 680–85, 106 S.Ct. at 1436–1438. Cox's testimony made it clear that it was only after he was "in trouble" that he came forward to tell authorities about Defendant's remarks. Although he denied any deal, and there is no proof there was a deal, he said that he had hoped there might have been one. The jury also heard he had served only six months on a guilty plea to voluntary manslaughter. The Defendant's confession to his niece and the presence of his fingerprints in the bedroom corroborated Cox's testimony. We find no reversible error.

## PHOTOGRAPHS AT THE SENTENCING HEARING

The Defendant alleges that the trial court erred in admitting into evidence certain photographs of the victim during the sentencing hearing. In its case in chief at sentencing, the State introduced into evidence several photographs over Defendant's objections. On appeal, the Defendant contends that three of these photographs should not have been admitted because the prejudicial effect outweighs their probative value. The State contends that the photographs were relevant to show the "especially heinous, atrocious, or cruel" aggravating circumstance.

■ The first picture complained of is a color photograph of the victim as she appeared when found lying in the bathtub. It shows the victim's clothing in disarray and a large bruise on her left hip. Another photograph of the victim's body taken during the autopsy illustrating the slash wound to the neck was also admitted. It is the worst of the three photographs and is undeniably gruesome. The final photo shows the bruises to the victim's face as they appeared at the time of the pathologist's examination. All three of the photographs are relevant to aggravating circumstance (i)(5). *See State v. Payne,* 791 S.W.2d 10, 19–20 (Tenn.1990); *State v. Miller,* 771 S.W.2d 401, 403–404 (Tenn.1989); *State v. Porterfield,* 746 S.W.2d 441, 449–450 (Tenn.1988); *State v. McNish,* 727 S.W.2d 490, 494–495 (Tenn.1987). We find that the probative value of these photographs is not substantially outweighed by their prejudicial effect and that the trial court did not abuse its discretion in admitting these photographs at the sentencing hearing.

## THE DEATH PENALTY STATUTE

### A.

#### *State v. Middlebrooks*

The Defendant alleges that T.C.A. § 39–13–204(i)(7) fails to narrow the class of death eligible defendants. The Defendant states that the felony murder aggravating circumstance insufficiently narrows the population of death eligible defendants where a defendant is convicted of felony murder, citing *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn. 1992). In *Middlebrooks,* a majority of this Court held that (i)(7) could not be used as an aggravating circumstance to support the imposition of the death penalty for a conviction of felony murder because it failed to narrow the class of death eligible murderers as required by Article I, Section 16, of the Ten-

nessee Constitution. *Middlebrooks* has now been reconsidered by the presently constituted Court and in *State v. Bigbee,* 885 S.W.2d 797 (Tenn.1994) (Justices Drowota and O'Brien dissenting), which opinion was filed contemporaneously with this opinion, a majority of this Court reaffirmed *Middlebrooks.*

The State avers, however, that two valid aggravating circumstances strongly supported by the proof remain after (i)(7) is removed. The State points out that in *State v. Bobo,* 727 S.W.2d 945, 955–956 (Tenn. 1987), multiple aggravating circumstances were clearly established and that, although little evidence of any mitigating circumstances existed, this Court held the jury's consideration of an invalid aggravating circumstance was harmless error beyond a reasonable doubt. The Defendant, Smith, responds that "[t]here is a legitimate issue as to whether harmless error analysis is *ever* appropriate in the context of penalty phase findings of an invalid aggravating circumstance, see Comment, 'Deadly Mistakes: Harmless Error in Capital Sentencing,' 54 U.Chi.L.Rev. 740, 749–58 (1987); *see also State v. Black,* 815 S.W.2d 166, 198 (Tenn. 1991) (Reid, C.J., dissenting)."

### B.

### HARMLESS ERROR ANALYSIS

In *State v. Howell,* 868 S.W.2d 238 (Tenn. 1993), and in our most recent opinion in *Barber v. State,* 889 S.W.2d 185 (Tenn.1994) (filed contemporaneously with this opinion) we held that a harmless error analysis is appropriate in the context of penalty phase findings of an invalid aggravating circumstance and stated that:

> In order to guarantee the precision that individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limit-

ed to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

*Howell,* 868 S.W.2d at 260–261.

We now consider whether, based on the facts in this case, the sentencing jury's consideration of the invalid felony murder aggravating circumstance is harmless beyond a reasonable doubt where there are two remaining aggravating circumstances consisting of (1) the Defendant's prior violent felony convictions and (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. T.C.A. § 39–2–203(i)(2) and (5)(1982) [now § 39–13–204(i)(2) and (5) (1991) ]. In *Howell,* the sole remaining aggravator consisted of previous convictions of felonies involving the use of violence to the person. In *State v. Cazes,* 875 S.W.2d 253 (Tenn.1994), the two remaining aggravators were the same as in this cause. In *Cazes* we held "no additional evidence, nor any evidence that was not already properly before the jury, was introduced in support of the invalid felony-murder aggravating circumstance. A sentencing jury may properly hear evidence regarding the circumstances of the offense." 875 S.W.2d at 270. In *Cazes* we concluded, beyond a reasonable doubt, that the sentence would have been the same had the jury given no weight to the invalid felony murder aggravating factor; therefore, the *Middlebrooks* error was harmless.

In the present case the aggravating factors were clearly established. Mrs. Brewer had been beaten all over her body and her throat had been cut twice. Either throat wound would have been fatal according to the forensic pathologist who testified. The pathologist further stated that drowning had also played a role in her death. As stated earlier in this opinion, the jury could have inferred from the evidence that the victim was alive and conscious during the rape, beating, slashing and drowning. The second remaining aggra-

vating factor was also established in that the Defendant had previously been convicted of robbery with a deadly weapon, assault with intent to commit first-degree murder, and aggravated rape.

We have examined both the quantum and quality of the mitigating factors presented by the proof. Likewise, we have examined the evidence supporting the remaining aggravating factors, which are undisputed and overwhelming. No additional evidence, nor any evidence that was not already properly before the jury, was introduced in support of the invalid aggravating circumstance. During the prosecutor's closing argument at sentencing, there was little emphasis on the robbery. The prosecutor's argument dealt primarily with the heinous, atrocious and cruel aggravator and the "horrible" death of the eighty-eight-year-old victim. Therefore, after careful analysis, we conclude beyond a reasonable doubt that the sentence would have been the same had the jury given no weight to the invalid felony murder aggravating factor.

## C.

### IMPOSITION OF THE DEATH SENTENCE

The Defendant complains of (1) the "unlimited discretion" of the prosecutor to determine whether to seek the death penalty; (2) the discriminatory imposition of the death penalty based upon wealth, race, geography, and gender; (3) the lack of uniform standards for jury selection (i.e., mandatory sequestered individual voir dire); (4) the prejudicial effects of death qualification on the jury; (5) restrictions on Defendant's addressing the jury on matters such as parole eligibility, deterrence, costs of the death penalty and methods of execution; (6) the requirement of unanimity for a verdict and prohibition against informing the jury about the effect of their failure to agree; (7) and (8) the violation of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), because

jurors must unanimously agree that aggravating circumstances do not outweigh mitigating circumstances and because the jury is not informed of the meaning and function of mitigating circumstances; (9) the "mechanistic" procedure for sentencing which deprives the jury of the need to make the determination that death is the appropriate sentence; and (10) the rule allowing the State final closing argument at sentencing.

The substance of these arguments has been rejected in *State v. Cazes*, 875 S.W.2d 253 (Tenn.1994); *State v. Smith*, 857 S.W.2d 1 (Tenn.1993); *State v. Black*, 815 S.W.2d 166 (Tenn.1991); *State v. Boyd*, 797 S.W.2d 589 (Tenn.1990); *State v. Teel*, 793 S.W.2d 236 (Tenn.1990); and *State v. Thompson*, 768 S.W.2d 239 (Tenn.1989). These issues are without merit.

## D.

### ELECTROCUTION

The Defendant next contends that electrocution is cruel and unusual punishment. This argument was rejected by a majority of this Court in *State v. Black*, 815 S.W.2d at 178–179 (Tenn.1991).

## E.

### APPELLATE REVIEW

The Defendant also avers that the appellate review process is constitutionally inadequate. He alleges that there is no meaningful appellate review in Tennessee because of a lack of written findings by the jury as to mitigating circumstances, the inadequate and incomplete informational base for comparative review, and a "flawed" methodology for conducting comparative review. The Court, the Defendant charges, acts "at its whim" and does not enforce the capital defendant's statutory rights under T.C.A. § 39–13–206. This Court has previously found its proportionality review sufficient. *See, e.g., State v. Cazes*, 875 S.W.2d 253, 270–271 (Tenn.1994); *State v. Barber*, 753 S.W.2d 659, 663–668 (Tenn.1988); *State v. Melson*, 638 S.W.2d

342, 367 (Tenn.1982). *Cf. State v. Harris,* 839 S.W.2d 54, 77, n. 2 (Tenn.1992).

As in *Cazes,* 875 S.W.2d at 270, we reject the dissent's contention that the absence of a Rule 12 report precludes adequate appellate and comparative proportionality review. In this case, a Rule 12 report is not necessary for proportionality review because the entire record provides a thorough basis on which the Court may review the case. We also reject the dissent's charges that comparative proportionality review as practiced by this Court offers only "meager safeguards" to the capital defendant. We repeat, "Because we do not find it necessary in every case to compare in writing, detail by detail, all the specific cases or circumstances which are considered in our proportionality review, it does *not* follow, ... that we have failed to perform an effective comparative proportionality review." *Id.* (emphasis in original).

## CONCLUSION

We find no reversible error in the guilt or sentencing phases of this case. In accordance with the mandate of T.C.A. § 39–13–206(c)(1)(D) [formerly T.C.A. § 39–2–205(c)(4) ], we find that the sentence of death was not imposed in an arbitrary fashion, that the evidence supports the jury's finding of the two valid aggravating circumstances, and that the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances so found. Further, our comparative proportionality review convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the Defendant. We have studied, compared and analyzed cases, and conducted a meaningful proportionality review as outlined in *State v. Barber,* 753 S.W.2d 659, 663–668 (Tenn.1988). *See State v. Cazes,* 875 S.W.2d 253 (Tenn. 1994); *State v. House,* 743 S.W.2d 141 (Tenn. 1987); *State v. Duncan,* 698 S.W.2d 63 (Tenn.1985). Contrary to the assertion in the dissent that our review is nothing more than "a rubber stamp for lower court death-

penalty determinations," we have made an independent, conscientious and thorough review of this case, as we have in every other capital case that has come before this Court. As a result of that review, we are of the opinion that the senseless and brutal killing of this elderly woman clearly warrants the imposition of the death penalty. We, therefore, affirm the conviction of first-degree murder and the sentence of death. The sentence will be carried out as provided by law on the 10th day of January, 1995, unless otherwise ordered by this Court or by other proper authority. Costs are adjudged against the Defendant.

O'BRIEN, C.J., and ANDERSON, J., concur.

REID, J., concurs in part and dissents in part.

DAUGHTREY, J., not participating.

REID, Justice, concurring in part and dissenting in part.

Despite some reservations regarding the majority's response to the assignments of error charging discrimination based on race, the defendant is a black male and the victim was a white female, I concur with the majority's decision affirming the conviction of first degree felony murder.

The language of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), is particularly applicable to the facts of this case: "a 'pattern' of strikes against black jurors ... might give rise to [the] inference of discrimination" required to establish a *prima facie* case of purposeful discrimination in selecting the jury.

> Once the defendant makes a *prima facie* showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors.

*Id.* at 97, 106 S.Ct. at 1723. The first five peremptory challenges exercised by the

State were of black prospective jurors. The majority opinion appears to acknowledge that a *prima facie* case of discrimination was established as to the peremptory strike which is at issue in this appeal, thereby shifting the burden of proof to the State to present a neutral reason for the strike. The evidence supporting the State's proposition that its strike was based on the juror's hostility, evasiveness, and opposition to the death penalty is meager. In exercising its duty to determine if the State's "neutral explanation" is adequate, a trial court should require clear and specific reasons for peremptory strikes to prevent the assurance of equal protection from becoming "vain and illusory." *Id.* at 98, 106 S.Ct. at 1724 (quoting *Norris v. Alabama,* 294 U.S. 587, 598, 55 S.Ct. 579, 583–84, 79 L.Ed. 1074 (1935)).

I agree that, because the issue of intentional discrimination turns in large part on the credibility of the prosecutor, great deference must be given to the decision of the trial court. Consequently, on this record, I am not prepared to say the defendant has presented a basis for reversing the conviction.

### SENTENCING

I would reverse the sentence of death because the defendant is not death-eligible under Tennessee law, and, in the penalty phase of the trial, the trial court committed prejudicial errors which the majority fails to acknowledge. The sentence of death is precluded in this case by T.C.A. § 39–13–203, which prohibits the execution of persons who are mentally retarded. And further, not only did the trial court find the defendant to be death-eligible, it refused to allow evidence of the defendant's retardation in mitigation. In this poorly tried case, the majority has denied all assignments of error or found that the errors assigned were harmless, and then concluded with the statement, "We are of the opinion that the senseless and brutal killing of this elderly woman warrants the imposition of the death penalty." It was a brutal murder and a senseless murder, senseless in that it was committed by a person legally not accountable for his criminal acts, and brutal

like all murders are brutal. Whatever may be the majority's opinion, its conclusion is not supported by the law properly applied to the facts of this case. This, in my view, is the practice condemned in Justice Stevens' concurring opinion to *Barclay v. Florida,* 463 U.S. 939, 972–73, 103 S.Ct. 3418, 3436–37, 77 L.Ed.2d 1134 (1983), of becoming "a rubber stamp for lower court death-penalty determinations." *See also, State v. Black,* 815 S.W.2d 166, 194–95 (Tenn.1991) (Reid, C.J., concurring & dissenting).

### MENTAL RETARDATION UNDER T.C.A. § 39–13–203

Prior to trial, the defendant made a motion that the trial court determine that the provisions of T.C.A. § 39–13–203 precluded the imposition of a sentence of death in this case. The statute provides that "no defendant with mental retardation at the time of committing first degree murder shall be sentenced to death." T.C.A. § 39–13–203(b). This code section represents a statutory enactment, and perhaps a constitutional declaration, that "contemporary standards of decency" in Tennessee forbid the execution of persons who are mentally retarded. *State v. Black,* 815 S.W.2d at 193 (Reid, C.J., concurring & dissenting).

The proof shows that the defendant is retarded, as defined by the statute. Under the statute a person is mentally retarded if he or she exhibits:

(1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below; [and]

(2) Deficits in adaptive behavior....

T.C.A. § 39–13–203(a). The statute also provides that "[t]he mental retardation must have been manifested during the developmental period [of the defendant], or [by the age of] eighteen (18)." T.C.A. § 39–13–203(a)(3). The defendant has the burden of proving mental retardation by a preponderance of the evidence. T.C.A. § 39–13–203(c).

The trial court's finding with regard to the defendant's motion is not clear. The court

apparently found that the defendant's intelligence level was not low enough to meet the first requirement of the statutory definition of mental retardation. However, the evidence shows that conclusion to be wrong. Even the State does not dispute that the defendant's mental functioning was below a functional intelligence quotient of 70, the statutory standard, and that the retardation was manifested during the defendant's developmental period and prior to age 18. Thus it is conceded that the defendant met the first and third portions of the statutory definition of mental retardation.

The State's sole reliance is that the defendant "did not prove by a preponderance of the evidence that he has suffered deficits in his 'adaptive behavior' as a result of his IQ." In this respect, it should be noted that the statute requires only a finding of deficits in adaptive behavior; it does not matter what caused the deficits—whether low IQ, parental neglect, or an inadequate social environment. *See In re Elmore*, 13 Ohio App.3d 79, 468 N.E.2d 97, 104 (1983). The statute clearly provides that adaptive behavior and intellectual functioning are independent criteria, a point obviously not understood by the trial court.

The significant question presented, and an issue of first impression for this Court, concerns the proof necessary to establish "deficits in adaptive behavior." As the majority opinion notes, the statute does not further define the phrase "deficits in adaptive behavior." The majority then concludes that the Court must rely upon the "ordinary" meaning of the language and construes the phrase to mean "the inability of an individual to behave so as to adapt to surrounding circumstances." In reaching this conclusion, the majority erroneously rejects the defendant's assertion that the phrase "deficits in adaptive behavior" is a well-defined term of art, found in the American Association on Mental Retardation (AAMR) manual, *Classification in Mental Retardation* (1983). The definition

of mental retardation contained in § 39–13–203(a), closely tracks that adopted by the AAMR, which is "the current and generally accepted definition of 'mental retardation.'" *See ABA Standards for Criminal Justice*, 7–9.1, Commentary n. 4 (2d ed. 1980). Variations thereof are found in a substantial number of state statutes, including T.C.A. § 39–13–203.[1] *See, e.g.*, Ga.Code Ann. § 17–7–131(a)(3) (Supp.1994); Ky.Rev.Stat. § 532.130(2) (1990); Md.Code Ann. Art. 27, § 412(e)(3) (1992).

It is apparent that "adaptive behavior" is a term of art with a settled meaning. *See* J. Ellis & R. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo.Wash.L.Rev. 414, 422 (1985). Words of art or technical terms in a statute are to be taken in their technical sense unless it is clear from the context that another sense was intended. *Cordis Corp. v. Taylor*, 762 S.W.2d 138, 139–140 (Tenn.1988). *See generally* 2A *Sutherland Statutory Construction* § 47.29 (5th ed. 1992). In such circumstances, it is reasonable to conclude that the language in a statute is intended to import a generally accepted definition of the term among the members of the discipline or profession in which it is used. Resort to material which is admissible under the Rules of Evidence was not necessary. The meaning of such terms may be gathered from definitions found in technical dictionaries and treatises. *See Cordis Corp. v. Taylor*, 762 S.W.2d at 140.

By codifying the phrase "adaptive behavior" without further defining its meaning, the General Assembly intended that those words be taken in their generally accepted technical sense. According to the AAMR's *Classification in Mental Retardation*, "deficits in adaptive behavior," as used in T.C.A. § 39–13–203(a), means

significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are

---

1. Similar definitions of mental retardation tracking the language of the AAMR definition are used in other sections of the Code. *See* T.C.A. §§ 33– 1–101(15) and 33–5–303(1) (dealing with mental health).

expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales.

*Classification in Mental Retardation* at 11 (1983).

Apparent from this definition is the need for clinical evaluation in determining deficits in a defendant's adaptive behavior. *See, e.g., State v. Benton*, 759 S.W.2d 427, 429 (Tenn. Crim.App.1988) (Vineland Adaptive Behavior Scale used to evaluate defendant); *cf.* T.C.A. § 33-5-305(c) (requiring that at least one witness at a commitment hearing for a mentally retarded offender "be a licensed or qualified mental retardation professional").

The hearing in the present case illustrates the perils of assessing the adaptive behavior of a defendant without recourse to clinical evaluation.

> Most of the mentally handicapped who are arrested fit into the "mildly retarded" category; criminal suspects with IQs below fifty are relatively easy to identify and typically are diverted from the criminal justice system to state facilities for the mentally retarded. Mildly retarded defendants, however, face special difficulties in the criminal system. They may wear a " 'cloak of competence' that allows them to 'pass as normal.' " Consequently, lawyers and judges frequently are unable to identify them as retarded.

P. Fetzer, *Execution of the Mentally Retarded: A Punishment without Justification*, 40 S.C.L.Rev. 419, 424–425 (1989) (footnotes omitted). The trial court's cursory findings, indeed the entire proceedings, reveal a lack of understanding of the criteria that must be considered in deciding whether the definition of mental retardation in T.C.A. § 39-13-203 has been met. This lack of understanding is indicated by the trial court's statement, "[e]ven Dr. Hutson doesn't say that he's retarded," while the entire import of Dr. Hutson's testimony was that the defendant was in fact retarded.

While the burden was on the defendant to establish that he is mentally retarded, the

evidence in this case and the definition placed upon the statute by the trial court call into question the holding of the court on this issue. The proof reveals that the defendant's IQ met the first requirement of the statutory definition. Likewise, the third requirement, manifestation of mental retardation, was met. As to the second statutory requirement, the evidence shows "significant limitations" in the defendant's maturation, learning, personal independence, and/or social responsibility in light of his age and cultural group. The record reveals that the defendant withdrew from school in the ninth grade. He had never had regular employment and had resided his entire life with his mother. At the age of fifteen, he had begun having difficulties with the juvenile authorities. The only time the defendant has exhibited any ability to function effectively was when he was in the very structured setting of imprisonment.

Evidence of the defendant's inability to live independently, remain gainfully employed, or abide by community standards of acceptable behavior is sufficient to establish that he suffered from "deficits in adaptive behavior," even under the majority's unartful definition of mental retardation. This evidence established by a preponderance of the evidence that the defendant is mentally retarded and not subject to the punishment of death under the legislative directive of T.C.A. § 39-13-203.

### FAILURE TO ALLOW EVIDENCE OF MITIGATING CIRCUMSTANCES

The majority opinion finds that Dr. Hutson's opinion concerning the validity of the defendant's score on the "Beta IQ test" was relevant to sentencing issues and therefore should have been admitted at the sentencing hearing. The majority, however, holds that the trial court's error in this respect was harmless beyond a reasonable doubt because this information was *indirectly* presented to the jury as a mitigating factor when the defendant asked Dr. Hutson about *other* intelligence tests.

A court cannot, consistent with the Eighth and Fourteenth Amendments of the United

States Constitution and Article I, § 16 of the Tennessee Constitution, withhold from the sentencer evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigates against the imposition of the death penalty. *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *State v. Harris,* 839 S.W.2d 54, 75 (1992). The error in this case is of constitutional dimension, *see Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); and harmlessness must be determined beyond a reasonable doubt. *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The primary mitigating circumstance presented by the defendant concerned his limited mental capacity. The jury was allowed to hear that the defendant had received a score of 88 on the "Beta IQ test" but not allowed to hear Dr. Hutson's testimony that the "Beta IQ test" did not measure the critical statutory factor determining retardation. Denying the defendant the opportunity to present evidence that this so-called IQ test, containing a numerical indicator higher than the statutory level when measured by a valid test, was not valid, in all reason, affected the jury's conclusion as to the defendant's level of mental capability. The majority's conclusion that the fact that the "Beta IQ test" was not an IQ test at all for the purpose of determining mental retardation was communicated to the jury by Dr. Hutson's statement that "the two IQ tests most commonly used were the Wechsler and Stanford–Binet," *and* that this statement by Dr. Hutson "implied that these two were valid IQ tests in comparison with the Beta IQ test" [2] is sophistry, at best. The majority's further conclusion, that this conceded violation of the defendant's Eighth and Fourteenth Amendment rights [3] regarding the most significant fact in the case was

harmless beyond a reasonable doubt, is absolutely implausible. I would hold that this error entitles the defendant to a new sentencing hearing.

## MIDDLEBROOKS ERROR

The majority concludes that the jury's consideration of an invalid aggravating circumstance, that the murder was committed during the course of a felony, *see State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992), was harmless error. The majority dismisses the *Middlebrooks* issue with a recitation of the evidence supporting the two remaining aggravating circumstances, and the conclusion that the jury would have imposed the sentence of death had "the jury given no weight to the invalid felony murder aggravating factor." [4]

I can do nothing more than state again the settled law:

> The issue on harmless error analysis is whether the Court can conclude that beyond a reasonable doubt the invalid aggravating circumstance did not influence the jury in its determination that the sentence would be death. The issue is not the extent to which the aggravating and mitigating circumstances were supported by the evidence or whether the aggravating circumstances outweighed the mitigating circumstances. A finding that the evidence in support of the valid aggravating circumstance was overwhelming and the evidence in mitigation was meager may, ... support the jury's finding that beyond a reasonable doubt the aggravating circumstance outweighed the mitigating circumstances, but it does not necessarily follow that the jury was not influenced by the invalid aggravating circumstance.

*State v. Howell,* 868 S.W.2d 238, 269 (Tenn. 1993) (Reid, C.J. concurring). In *Howell,* I stated, in concurrence, that in a capital case where "a court can conclude beyond a rea-

---

2. Majority opinion at 922.

3. The majority does not mention Article I, § 16 of the Tennessee Constitution.

4. Majority opinion at 926.

sonable doubt that there was no evidence before a jury which could influence its decision," it can find that admission of an invalid aggravator is harmless error. *Id.* at 270. But, "in all cases where the Court must make a subjective decision regarding the effect of the aggravating circumstance," harmless error analysis is inappropriate. *Id.* at 268. In this case, although the two remaining aggravating circumstances were proven, and no additional evidence was admitted in support of the invalid aggravating circumstance, the evidence of mental retardation is a strong mitigating factor whose weight could well be more persuasive against two aggravating circumstances than three. Because the existence of substantial mitigating evidence forces the jury in this case to make a very subjective decision as to weight, the State, which has the burden of proof, cannot show beyond a reasonable doubt that the ultimate decision to execute the defendant was not *influenced* by the submission of the invalid aggravating circumstance; therefore, the submission of this circumstance was not harmless error, and resentencing is required. *See State v. Middlebrooks,* 840 S.W.2d at 347.

## PROPORTIONALITY REVIEW

For the reasons I have set forth in previous cases, *see, e.g., State v. Nichols,* 877 S.W.2d 722, 744 (Tenn.1994) (Reid, C.J., dissenting); *State v. Cazes,* 875 S.W.2d 253, 272 (Tenn.1994) (Reid, C.J., concurring & dissenting); *State v. Harris,* 839 S.W.2d at 84–85 (Tenn.1992) (Reid, C.J., dissenting); *State v. Black,* 815 S.W.2d at 193–195 (Tenn.1991) (Reid, C.J., concurring & dissenting); I dissent from the majority's summary holding that its comparative proportionality review "convinces" one that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. As in *State v. Cazes,* the Court has

before it another example of the deficiencies afflicting the meager safeguards of comparative proportionality review as practiced by this Court.

In this case, the report required under Rule 12 of the Supreme Court does not appear in the record and was not transmitted to the Clerk of the Supreme Court. Presently, the Rule 12 reports are the sole resource for a comparative proportionality review, yet the trial court has failed to file a Rule 12 report to be considered by the Court in its mandated proportionality review. Consequently, there is in the record no basis on which to make a comparative proportionality review.

Like *State v. Nichols,* 877 S.W.2d 722 (Tenn.1994), this is the kind of case in which a procedure for comparing cases is necessary to provide a meaningful review. Here, a comparative analysis would give a clear answer as to whether defendants with this level of IQ have been subjected to execution; and any meaningful comparative analysis must include a study of Rule 12 reports to resolve this question. Slightly over 200 of the Rule 12 reports filed with the Court at this time contain information regarding the defendant's IQ. Of these defendants, only 20 are described as possessing a "low" IQ, i.e., an IQ below 70. Of these 20 only two are among the approximately 90 persons sentenced to death for whom Rule 12 reports are currently on file.[5] This is a significant disparity; it suggests the capriciousness and arbitrariness prohibited by the constitution. *See State v. Middlebrooks,* 840 S.W.2d 317, 350–51 (Tenn.1992) (Reid, C.J., concurring & dissenting). Nevertheless, the majority opinion is silent on this point, except to recite that it has conducted a "meaningful" proportionality review. The deficiency in the process requires that the defendant be granted a resentencing hearing or the sentence be reduced to life imprisonment.

**5.** The Rule 12 report requires that the trial court disclose the "intelligence level" of the defendant where this information is known. *See* Section B(9), Supreme Court Rule 12 Report. Of those defendants on whom a sentence of death has been imposed, only Ricky Goldie Smith, *see State*

*v. Smith,* 695 S.W.2d 954 (Tenn.1985), and Michael Angelo Coleman, *see State v. Coleman,* 619 S.W.2d 112 (Tenn.1981), were listed as having a "low" IQ, meaning an IQ below 70. The death sentences in both of these cases were affirmed prior to the adoption of T.C.A. § 39–13–203.

## CONCLUSION

Because the evidence in this case establishes that the defendant is mentally retarded under the provisions of T.C.A. § 39–13–203(a) and, thus, ineligible for the death penalty, I dissent from the majority's holding affirming the sentence in the present case. Furthermore, even if the proof did not show that the defendant was mentally retarded, I would hold that the several errors discussed so prejudiced the sentencing phase of the trial that a new sentencing hearing is constitutionally required.

## OPINION ON PETITION TO REHEAR

DROWOTA, Justice.

A petition for rehearing has been filed on behalf of Appellant, Sylvester Smith. After consideration of the same, a majority of the Court is of the opinion that the petition should be denied. Justice Reid, in his dissent to this order denying the petition to rehear, would adopt the American Association of Mental Retardation's (AAMR) definition of "deficits in adaptive behavior" and concludes that "according to that definition, the Defendant is not death eligible." Even under the AAMR definition, however, the Defendant has failed to establish that he suffered deficits in adaptive behavior.

The petition also argues that the State's proof of the Defendant's ability to adapt to prison did not show his ability to adapt to society; however, this argument incorrectly places the burden on the State to establish that the Defendant was not mentally retarded and ignores the fact that under the statute, See T.C.A. § 39–13–203(c), (e), the burden is on the Defendant to demonstrate deficits in adaptive behavior by a preponderance of the evidence, something the petitioner in this case failed to do.

A majority of this Court is of the opinion that the Defendant did not carry the burden of showing that he was mentally retarded.

For the above reasons, the petition to rehear is denied at the cost of Appellant.

1. T.C.A. § 39–13–203(a)(1), (2), (3).

O'BRIEN, C.J., and ANDERSON, J., concur.

REID, J., dissents.

REID, Justice, dissenting in Order denying petition to rehear.

I dissent from the order denying the defendant's Petition to Rehear because the petition presents undeniable authority that the defendant is not death eligible under T.C.A. § 39–13–203.

The affirmations of the conviction and the sentence, and the denial of the petition to rehear, are based on the majority's finding that the legislature did not define "deficits in adaptive behavior" when it enacted T.C.A. § 39–13–203 (1990). The majority then bases its denial of relief upon its definition of mental retardation. Supra at 918.

"Deficits in adaptive behavior" is one of three components of mental retardation.[1] As discussed in the dissent, the State conceded that the other two components were established by the proof. The proof also clearly established "deficits in adaptive behavior" as defined in the American Association on Mental Retardation's (AAMR's) manual entitled Classification in Mental Retardation (1983). This manual, which contains technical definitions for all of the terms used in T.C.A. § 39–13–203, defines "deficits in adaptive behavior" as follows:

Deficits in adaptive behavior are defined as significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales.

The majority rejected this definition, stating

It would be expected that the General Assembly would have included a definition of the term "deficits in adaptive behavior"

or referred to those materials in which a definition or standards could be found if it had meant for this term, or the statute as a whole, to have been interpreted in a way other than its ordinary meaning.

*Supra* at 917.

If there were any doubt regarding the definition of this critical phrase, the answer is found in the legislative history of the statute: "Once we conclude that the proper interpretation [of the statute] is left open to dispute, it is appropriate to turn to the legislative history of the statute for guidance." *Chapman v. Sullivan County*, 608 S.W.2d 580, 582 (Tenn.1980).

In the petition to rehear, the defendant presents the following legislative history of T.C.A. § 39–13–203:

On March 13, 1990, Representative Jackson, the sponsor of the bill in the House, addressed the House Judiciary Committee, and said,

The bill *adopts the standard definition of mental retardation recognized by the American Association of the Mentally Retarded.*

Tape: H. Judiciary # 1, 3/13/90 (1225) (emphasis added).[2]

Also on March 13, 1990, Senator Henry, the sponsor of the bill in the Senate, addressed the Senate Judiciary Committee, and said,

The *terminology set out in the bill is of a technical nature,* but it is susceptible of proof. If the Committee would be willing to hear Mr. Blue, who is an expert in this field, to respond to Senator Cohen's question, I think he could do it better than I could because of the technicalities of retardation I'm not that up on.

Tape: S. Judiciary # 1, 3/13/90 (1580) (emphasis added).

Roger Blue, the executive director of the Association for Retarded Citizens of Ten-

nessee, addressed the Senate Judiciary Committee, and said,

The definition, as spelled out in this legislation, is the accepted definition of the American Association on Mental Retardation, which is the universally accepted definition used in the field (1602). * * * [Mental retardation] is a very specific kind of evaluation. It is based on a whole battery of testing that has to be done, not just on intelligence (1640). * * * There is a whole battery of exams from testing adaptive behavior [to] everything else that is related to that, not just IQ in itself (1758). * * * There are very specific kinds of testing standards used to determine mental retardation (1840).

Tape: S. Judiciary # 1, 3/13/90 (emphasis added).

On March 13, 1990, Judge Barbara Haynes of the Tennessee Sentencing Commission also addressed the Senate Judiciary Committee, and said,

If a person has stood trial and been found guilty of murder in the first degree, then the judge will make the determination that this person is retarded, and if that person, *under the national guidelines,* not one that's mentally ill or sick, if that person meets *the national guidelines,* they will be automatically sentenced to life in prison.

Tape: S. Judiciary # 1, 3/13/90 (2055) (emphasis added).

On April 3, 1990, Gary Halsepian, an attorney with the Tennessee Department of Mental Health and Mental Retardation, addressed the Senate Judiciary Committee, and said,

[T]he *universally accepted definition of mental retardation by the American Association on Mental Retardation is the one that is incorporated in this bill.* It also is the same definition of mental

---

**2.** Numbers appearing in parentheses indicate the counter numbers on the tape where the quoted statements appear.

retardation that is currently in our state law in the Mental Health and Mental Retardation Title 33 definition of mental retardation, and it also is the one that ... the ABA recommends.

Tape: S. Judiciary # 3, 4/3/90 (540) (emphasis added).

Finally, on April 5, 1990, Representative Jackson addressed the full House, and said,

What amendment # 1 does, *it adopts the definition of mental retardation that is the nationally accepted definition adopted by the national association for the mentally retarded.*

Tape: H–62 Session # 1, 4/5/90 (260) (emphasis added).

This legislative history establishes beyond dispute that the legislature adopted the AAMR definitions in the statute, which include the AAMR's definition of deficits in adaptive behavior. As previously stated, according to that definition, the defendant is not death eligible.

The majority opinion and the order denying the petition to rehear disregard a diagnosis accepted by the medical profession, the certain meaning of a legislative enactment, and a basic rule of statutory construction. The result is the defendant is denied a substantial right granted by the legislature and the law regarding the punishment of persons who are mentally retarded is hopelessly confused until the legislature writes again.

I would grant the petition to rehear and remand the case to the trial court.