## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### MAY SESSION, 1997

**FILED**

**October 24, 1997**

Cecil W. Crowson
Appellate Court Clerk



| | |
|---|---|
| STATE OF TENNESSEE, | ) |
| | ) |
| Appellee/ | ) |
| Cross-Appellant | ) |
| | ) |
| vs. | ) |
| | ) |
| PHYLISS ANN McBRIDE, | ) |
| | ) |
| Appellant/ | ) |
| Cross-Appellee | ) |

No. 01C01-9606-CC-00269

RUTHERFORD COUNTY

Hon. JAMES K. CLAYTON, JR., Judge

(First Degree Murder)

For the Appellant:

**LANCE H. SELVA**
214 West Main Street
Murfreesboro, TN  37130

For the Appellee:

**CHARLES W. BURSON**
Attorney General and Reporter

**LISA A. NAYLOR**
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493

**WILLIAM WHITESELL**
District Attorney General
Third Floor Judicial Building
Murfreesboro, TN  37130

OPINION FILED: _____

CONVICTION AFFIRMED;
REMANDED FOR SENTENCING MODIFICATION

**David G. Hayes**
Judge

## OPINION

The appellant, Phyliss Ann McBride, appeals her conviction, by a Rutherford County jury, for the first degree murder of her husband, Bobby McBride. The jury fixed the appellant's sentence at imprisonment for life. At a separate sentencing hearing, the trial court ordered the life sentence to run concurrently with seven prior unserved felony sentences.[1] In this appeal, the appellant contends that (1) the trial court failed to comply with the mandatory jury selection procedure set forth in Tenn. R. Crim. P. 24(c); and (2) the trial court improperly restricted cross-examination of a State's witness. Additionally, the State cross-appeals challenging the trial court's decision that the appellant's life sentence should be served concurrently with her seven felony sentences.

The judgment of conviction is affirmed. Upon *de novo* review of the record, however, we find that consecutive sentences are warranted and remand this case to the trial court for entry of an appropriate order.

## Background

In November 1989, the victim, Bobby McBride, began experiencing vision disturbances, shortness of breath, hallucinations, dizziness, and sleeplessness. As a result of his deteriorating condition, Mr. McBride was taken to the emergency room where he was treated for "a urinary tract infection and a throat infection." On November 13, 1989, approximately one week later, Mr. McBride was examined by his family physician, Dr. Polk. Dr. Polk testified that, despite a

---

[1] The seven outstanding felony convictions were committed by the appellant over a twenty-month period occurring after the death of Bobby McBride, but before the return of the indictment for his murder.

2

history of high blood pressure, Mr. McBride's blood pressure was very low and he appeared very confused. Moreover, the victim was bloated and had "this gray, ashen look. . . . He was washed down in perspiration. . . . His face was discolored. His eyes looked . . .like they were ready to pop out. . . ." Because of his condition, Mr. McBride was admitted to the hospital for further observation and tests. During the day, Mr. McBride's condition continued to deteriorate despite numerous medications and medical procedures. Later that evening, Mr. McBride died, the cause of death being undetermined by the attending physicians.[2] Due to the peculiar circumstances and unknown cause of Mr. McBride's death, the attending physicians and the county coroner requested, on several occasions, that an autopsy be performed. However, the appellant was opposed, stating that her husband would not have wanted an autopsy. Accordingly, no autopsy was performed and no further inquiry was made as to the victim's cause of death.

In July 1990, the appellant filed a complaint with the Sheriff's Department alleging that her father, Don Tiffin, Sr., had sexually abused her daughters. As a result of these allegations, deputies ordered Tiffin out of the appellant's house. A few days after these allegations were made, Tiffin volunteered to law enforcement officials that Bobby McBride's body should be exhumed, implicating the appellant in his death. In November 1990, an autopsy was performed on the victim's body. The autopsy report established the cause of death as "acute and chronic arsenic poisoning."

Testimony at trial connected the appellant to the murder of her husband. Don Tiffin, Sr. testified that, prior to the victim's death, the appellant had inquired

---

[2]The victim's death certificate indicated the cause of death as "cardiac arrest, cause unknown."

as to the effects of rat poison on a person. He further stated that the appellant received a life insurance check in the amount of $43,000, in addition to the victim's retirement benefits of $500.64 per month for the remainder of her life. Kim Bess, one of the appellant's daughters, testified that, prior to the victim's death, the appellant had asked her to put an electrical wire in the shower with the victim in order to kill him because she needed the money. Bess added that, on one occasion, she had observed the appellant "set [a can of drain opener] beside the refrigerator as she fixed [the victim] a glass of tea."

Carol Burgeson, an admitted informant for law enforcement agencies, testified that she was acquainted with the appellant through her management of a children's shop in Smyrna. She recalled that she was at the hospital on the day the victim was admitted and had spoken with the appellant concerning the victim's condition. The appellant related to her that the victim had "gotten a hold of some bad dope." Burgeson suggested that the police be notified, however, the appellant refused explaining that the police "would find out that he had been given too much cough medicine," over ten different types. The appellant further stated that "she did not want [the victim] to be all right, that she had given him too much . . . and that she wanted him to die; he was mean and bad, and he had to die." Based upon these facts, the appellant was convicted of first degree murder.

## I. Jury Selection

The appellant first contends that the jury selection procedure employed by the trial court violated Tenn. R. Crim. P. 24(c).[3] Both parties agree that the trial

---

[3]Tenn. R. Crim. P. 24(c) provides:
After twelve prospective jurors have been passed for cause, counsel will submit simultaneously and in writing, to the trial judge, the name of any juror either counsel elects to challenge peremptorily. Upon each submission each counsel

4

court deviated from the Rule in that thirty-one jurors were selected for voir dire rather than the twelve designated by the Rule.[4] The trial court seated twelve jurors in the jury box and four jurors in seats that were placed in front of the jury box. The remaining fifteen jurors were seated along the railing behind the actual trial area. Prior to implementing this procedure, however, defense counsel and the State met in the judge's chambers and discussed the mechanics of the jury selection process that would be utilized by the court. No objection was made by either the State or the defense as to the proposed method of jury selection.

The appellant asserts that defense counsel examined only those twelve jurors seated in the jury box and the four seated immediately in front of the box. She argues that there was no examination of those seated along the railing. During voir dire, defense counsel, recognizing his inadvertence, stated:

> By the way, I didn't mean to neglect you, but all the questions I've asked, if any of you happen to replace people up here, all those questions will apply to you.

Following jury selection, written challenges were submitted to the trial court. Two jurors were excused and replaced. However, after exercising the appellant's peremptory challenges, defense counsel asked to approach the bench, where the following colloquy occurred:

> MR. SELVA: We were under the impression that, really, we were questioning the jurors, and as they would be replaced, we would be able to ask specific questions to the jurors that took their seats.

shall submit either a challenge or a blank sheet of paper. Neither party shall make known the fact that the party has not challenged. Replacement jurors will then be examined for cause and, after passed, counsel will again submit simultaneously, and in writing, to the trial judge the name of any juror counsel elects to challenge peremptorily. This procedure will be followed until a full jury has been selected and accepted by counsel. peremptory challenges may be directed to any member of the jury and counsel shall not be limited to replacement jurors. Alternate jurors will be selected in the same manner. The trial judge will keep a list of those challenged and, if the same juror is challenged by both parties, each will be charged with the challenge. The trial judge shall not disclose to any juror the identity of the party challenging the juror.

(Emphasis added).

[4]We note that, effective July 1, 1997, Rule 24(c) was amended, dispensing with the requirement of "twelve" prospective jurors. See State v. Anthony, No. 02C01-9605-CC-00159 (Tenn. Crim. App. at Jackson, Mar. 18, 1997).

5

COURT: I explained that to you this morning, and you've seen us operate under that procedure.

MR. SELVA: Okay. That's fine.

MR. SHULMAN: Judge, there's only one question, I think, has not been asked that I think is important. Maybe you could do that. Somebody should have read the list of witnesses, both the State's and the defense, because we don't know whether any of these people are related to the witnesses or have any association with them, and I think that's fairly significant.

COURT: It's a little bit late to start reasking questions.

Written challenges were again submitted. One juror was replaced. The court announced that a jury was selected and drew two names for alternate jurors. One of the alternates was excused for cause. Another alternate was selected and the trial proceeded. The appellant argues that, because she was denied the opportunity to examine any replacement jurors, she was effectively denied her right to exercise any meaningful or intelligent challenge.[5] The appellant contends that the trial court's non-compliance with Rule 24(c) compromises the integrity of the jury selection process. She urges that we find that "<u>any</u> departure [from] Rule 24 constitutes plain error and [is] prejudicial *per se.*" The appellant cites no legal authority in support of her argument, as such, we decline the invitation to so rule and rely instead upon the standard of review announced in previous decisions.

Although the particular procedure employed by the trial court deviated from Tenn. R. Crim. P. 24(c), the burden is on the appellant to prove prejudice or purposeful discrimination in the selection of a jury. <u>State v. Coleman</u>, 865 S.W.2d 455, 458 (Tenn. 1993). Prejudice will not be presumed. <u>Id</u>. (citing <u>Swain v. Alabama</u>, 380 U.S. 202, 85 S.Ct. 824 (1965)). Moreover, while the "adherence to the procedure prescribed by Tenn. R. Crim. P. 24(c) is mandatory," deviation from the rule may qualify as harmless error. <u>See</u> <u>Anthony</u>, No. 02C01-9605-CC-00159.

_____

[5]The record reflects that of the twelve jurors selected, three were replacement jurors.

6

The appellant fails to show how she was prejudiced by the procedure employed by the trial court. Equally important, we note that not only did defense counsel not object to the method of jury selection, but also agreed to the method of selection prior to voir dire. See Tenn. R. App. P. 36(a) (A party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error). Defense counsel commented that the only question that should have been asked was whether any member of the jury knew any of the trial witnesses. Although the appellant alleges that he was denied the opportunity to question the three replacement jurors, the record indicates that all three jurors were present throughout the entire voir dire. Defense counsel informed all the prospective jurors that the questions applied to them. None of the prospective jurors indicated that they had any problem with the questions posed by either party. Accordingly, we conclude that absent a showing of prejudice, the deviation from the mandatory procedure of Tenn. R. Crim. P. 24(c) was harmless. This issue is without merit.

## II. Cross-Examination of Carol Burgeson

Next, the appellant argues that the trial court improperly restricted her cross-examination of State's witness Carol Burgeson, thereby, violating her Sixth Amendment right of confrontation. Specifically, the appellant sought to cross-examine this witness about various criminal charges against her which had previously been dismissed by the State. The trial court ruled that defense counsel could ask Burgeson about a prior conviction for theft, but could not question the witness about any charges that had been dismissed. The appellant contends that Tenn. R. Evid. 616 permits cross-examination as to the prior charges to establish the witness's bias in favor of the State.

7

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution to "be confronted with the witnesses against him." Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S.Ct. 1431, 1435 (1986). However, the right of confrontation "means more than being allowed to confront the witness physically." Id. (citation omitted). "[T]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." Id. (citations omitted) (internal quotations omitted) (emphasis in original). See also State v. Henning, No. 02C01-9504-CC-00115 (Tenn. Crim. App. at Jackson, Jan. 9, 1997). The exposure of a witness's motivation in testifying is a proper and important function of cross-examination. Id. at 678-679, 106 S.Ct. at 1435. Indeed, although limited to what is actually relevant evidence, an accused has the right to explore promises of leniency made to a prosecution witness or expectations of leniency, both real and imagined, by that same witness to show a motive for testifying falsely for the State. See State v. Smith, 893 S.W.2d 908, 824 (Tenn. 1994); State v. Scott, No. 01C01-9202-CR-00053 (Tenn. Crim. App. at Nashville, Feb. 11, 1993); Tenn. R. Evid. 616. See also Tenn. R. Evid. 402. However, the Confrontation Clause does not prevent a trial court from imposing reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness. Van Arsdall, 475 U.S. at 679, 106 S.Ct. at 1435. The propriety, scope, manner and control of testimony and other evidence, including the scope of cross-examination, remains within the sound discretion of the trial court, which will not be reversed absent an abuse of that discretion. See State v. Barnard, 899 S.W.2d 617, 624 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1994) (citing State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Elrod, 721 S.W.2d 820, 823 (Tenn. Crim. App. 1986)); Tenn. R. Evid. 611(a). Thus, so long as a reasonably complete picture of the witness's veracity, bias, and motivation is developed on direct, the trial court enjoys the power and discretion to set reasonable boundaries to cross-examination.

There is no indication from the record that Burgeson had an incentive to testify falsely against the appellant. She was not being paid for her testimony, nor did she testify in exchange for immunity or prosecutorial leniency since the proof fails to reveal any charges pending against her. Indeed, with the exception of one misdemeanor arrest for a worthless check, the charges at issue were dismissed prior to the return of the indictment in the instant case, and, in some instances, were dismissed prior to Bobby McBride's murder. Moreover, the credibility of this witness was not vital to the State's case as substantial circumstantial evidence was elicited from other witnesses. Although the trial court's ruling was based on Tenn. R. Evid. 608 and 609 rather than Rule 616, we cannot conclude that the trial court erred by prohibiting cross-examination of Burgeson's previously dismissed charges. We are unable to rationalize how proof of previously dismissed charges would show any promises of leniency by the State in exchange for Burgeson's testimony at the appellant's trial, nor can we conclude that the appellant expected future leniency from the State arising from her testimony in the present case. See People v. Tomes, 672 N.E.2d 289, 293 (Ill. App. 1 Dist. 1996) ("[W]here there is no expectation of leniency from the State, the trial court may prohibit cross-examination regarding the charge."); see also 98 C.J.S. Witnesses § 560(h) (1957). Again, evidence of the witness's activity as a paid informant was revealed during direct examination. Thus, the jury was presented with the possibility of her bias in favor of the State. The law is well-settled that the credibility of witnesses is a jury question. Byrge v. State, 575 S.W.2d 292 (Tenn. Crim. App. 1978). This issue is without merit.

### III. Sentencing

The State cross-appeals, challenging the trial court's order that the appellant's life sentence is to be served concurrently with seven outstanding

9

felony sentences.  See Tenn. Code Ann. § 40-35-115 (1990).  In support of its position, the State contends that the appellant (a) is a professional criminal, (b) has an extensive history of criminal activity, and (c) is a dangerous offender. Tenn.Code Ann. §§ 40-35-115(b)(1), (b)(2), and (b)(4).  After review of this issue, we agree that the appellant has an extensive history of criminal activity and that consecutive sentences are warranted in this case.[6]

When the State challenges the sentence imposed by the trial court, this court conducts a *de novo* review with a presumption that the determinations made by the trial court are correct.  Tenn. Code Ann. § 40-35-402(d) (1990). However, this presumption is only applied if there is an "affirmative showing in the record that the trial court considered relevant sentencing principles and all relevant facts and circumstances."  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).  The record before this court is absent such a showing, thus, the presumption does not apply. However, the party challenging the sentence, in this case the State, bears the burden of proving the impropriety of said sentence. Sentencing Commission Comments, Tenn. Code Ann. § 40-35-402.

Tenn. Code Ann. § 40-35-115 sets forth classifications under which consecutive sentencing may be imposed.  But see  Tenn. R. Crim. P. 32 (mandatory consecutive sentences).  If one of these classifications is not met, the court must order the sentences to run concurrently.  However, a finding by the trial court that one of these factors exists is not alone sufficient to justify the imposition of consecutive sentences. "The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender."  State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995).

---

[6]Tenn. Code Ann. § 40-35-402(c) grants the reviewing court the authority to "affirm, vacate, set aside, increase or reduce the sentence imposed or remand the case or direct the entry of an appropriate order."

Notwithstanding proof of these three criterion, a sentencing court retains the discretion of imposing consecutive sentences. On appeal, the exercise of the trial court's discretion is afforded great weight, provided the court correctly applied the principles of consecutive sentencing.

Upon *de novo* review, we conclude that the State's argument has merit. The appellant's prior record includes seven felony convictions and numerous misdemeanor convictions.[7] This is more than sufficient to establish that the appellant has an extensive history of criminal activity. See Tenn. Code Ann. § 40-35-115(b)(2). Moreover, we find that the appellant committed the instant offense while on probation from a June 30, 1989, conviction for passing a worthless check. Tenn. Code Ann. § 40-35-115(b)(6); see also State v. Franklin, No. 01C01-9405-CC-00172 (Tenn. Crim. App. at Nashville, Oct. 31, 1995). While a statutory classification for imposition of consecutive sentences is present, consecutive sentences should not be imposed unless such a sentence would reasonably relate to the severity of the offense and are necessary to protect the public from further criminal acts by the appellant. Wilkerson, 905 S.W.2d at 938. In addition to her conviction for the premeditated murder of her husband, the appellant has burned her house, and has committed numerous offenses of insurance fraud, theft, and passing worthless checks. We find that the aggregate sentences are reasonably related to the severity of the offenses and that an extended sentence is necessary to protect the public from further criminal acts of the appellant. Thus, we conclude that consecutive sentences are warranted in the present case.

---

[7]The presentence report revealed that the appellant has seven felony convictions for which she is serving an effective sentence of fourteen years in the Tennessee Department of Correction; all of these offenses occurred after Bobby McBride's death. These convictions involve arson; insurance fraud over $60,000; insurance fraud over $1,000; three counts of theft over $1,000; and passing a worthless check over $1,000. The record indicates misdemeanor convictions for passing a worthless check; three traffic offenses; and theft under $500. Moreover, the appellant was charged with the following crimes: theft of two telephones from K-Mart; theft of a Black Angus bull calf; sale of an untested cow; and trading livestock without a license; however, these charges were subsequently dismissed.

The judgment of conviction is affirmed.  The appellant's sentence of life imprisonment is ordered to run consecutively to her effective sentence of fourteen years stemming from her seven felony convictions.  This case is remanded to the trial court for entry of an order reflecting a sentence of life imprisonment plus fourteen years.


_____
DAVID G. HAYES, Judge



CONCUR:


_____
PAUL G. SUMMERS, Judge


_____
JERRY L. SMITH, Judge