# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 9, 2002 Session

## STATE OF TENNESSEE v. RHYNUIA LAMONT BARNES[1]

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-D-2542     Walter C. Kurtz, Judge**

---

**No. M2001-00631-CCA-R3-CD - Filed June 24, 2002**

---

The defendant was convicted of premeditated first degree murder by a Davidson County jury and sentenced to life imprisonment with the possibility of parole. In this appeal, he contends (1) the evidence was insufficient to sustain his conviction; (2) he was denied the opportunity to retain his counsel of choice; (3) the state committed prosecutorial misconduct when it failed to *sua sponte* redact a portion of an audio tape, and the trial court improperly denied the defendant's request for a mistrial; and (4) the trial court erred when it failed to instruct the jury on facilitation of first degree murder and voluntary manslaughter as lesser-included offenses of first degree murder. After reviewing the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. NORMA MCGEE OGLE, J., concurred in results only.

David A. Collins (on appeal) and Paula Ogle Blair (at trial), Nashville, Tennessee, for the appellant, Rhynuia Lamont Barnes.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Kymberly Haas and Bernard F. McEvoy, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

---

[1] The defendant was indicted under the spelling "Rhyunia," but all other pleadings use the spelling "Rhynuia," including those signed by the defendant and the records in this court. We will continue to utilize the spelling "Rhynuia."

Joyce Martin testified she lived with her two sons, 24 year-old Da'Shon Martin, the victim, and 19 year-old Carlton Martin. She stated that on September 2, 1997, at approximately 2:00 p.m., Tom Morrell, a neighbor, came to her door and asked if the victim were home. Martin responded the victim was sleeping in his room, and Morrell walked toward his room and told the victim someone wanted to see him. Morrell then walked out of the residence and returned to his home. Martin stated she looked outside her house and saw the defendant, whom she had never met, standing at her gate. The victim exited the residence, stood on the porch, and inquired what the defendant wanted. Martin said she next saw the defendant brandish a pistol, at which time the victim ran back inside the house. The defendant then said, "Your son stole my jewelry, and I'm going to kill him;" the victim ran to the back of the house; and the defendant ran to her backyard with his gun in his hand. Martin explained her back door was secured by a deadbolt key lock which required a key to open.

Martin further testified she phoned 911 while the victim was hiding in the back of the residence, and the defendant was in the backyard. The defendant then ran back inside her front door holding his gun. The defendant then said twice that he would shoot the victim's mother if the victim did not come out of hiding. At that point, the defendant ran toward the bathroom at the rear of the house, and another man, later identified as James Barnes, the defendant's father, entered the residence and inquired about his son. Martin told James Barnes the defendant went to the rear of the house. Martin testified she then heard one shot and fled from the residence to a neighbor's home. Martin identified the murder weapon as the gun she saw in the defendant's hand.

Tommy Morrell, a neighbor, testified that on September 2nd, the defendant arrived at approximately 3:00 p.m. riding in the front seat of a vehicle driven by an older man. Morrell testified the defendant requested he get the victim. Morrell further stated he went inside the victim's house and told the victim "two guys" wanted to see him, and Morrell exited the house. When Morrell reached the front gate, he saw the victim step onto the porch. Morrell later saw the defendant go inside the gate. Morrell further stated the older man was seated in the car.

Morrell explained he knew "something [was] going down," so he went back to his house and instructed his mother to stay inside. Morrell stated the older man exited the car; the defendant first ran in the house but then exited the house telling the older man that "[the victim] might have gone out the backdoor;" the defendant ran around one side of the house, while the older man ran around the other; the defendant ran back around to the front of the house and entered it brandishing a gun; the older man entered the house; and he heard a gunshot. Morrell stated he never saw the older man with a gun. On cross-examination, Morrell denied receiving drugs as compensation for summoning the victim outdoors.

Metro Police Officer Jerry Bottom testified he arrived on the scene within one minute of receiving the dispatch and saw the defendant running across the street holding his waistband. Officer Bottom stated his first priority was the victim, and since a second cruiser had arrived, he entered the victim's residence through the open front door and found the wounded victim on the floor. Officer Bottom stated he saw a man standing by a parked car when he initially arrived; he was

unsure if the defendant ran from inside the home; and the interior of the home exhibited no signs of a struggle.

Metro Police Officer Marshall James Brown testified he and his partner, Officer Chris Locke, arrived at the scene immediately after Officer Bottom. Officer Brown stated that while he and Officer Locke were walking toward the residence, the defendant ran from across the street and dove head first into the backseat of a parked car. He additionally stated James Barnes walked toward the vehicle's driver's side. He and Locke then detained them, and Joyce Martin identified them as the persons in her home. On cross-examination, Officer Brown stated James Barnes was bleeding from a cut on his hand.

Officer Chris Locke corroborated Officer Brown's testimony. He further testified the defendant made remarks after being arrested; he activated his pocket audio recorder to record the defendant; and he made notes during the defendant's outbursts. He testified the defendant, while being handcuffed, stated that the victim should not break in his house and steal his jewelry. At that point, Officer Locke placed the defendant in the rear seat of the cruiser, activated his pocket audio recorder, and sat in the driver's seat for approximately one hour and fifteen minutes. Officer Locke also wrote down the defendant's statements verbatim. Officer Locke testified from his written notes, which indicated the defendant said:

> I went in the house with him; I didn't shoot him; I threw my dope in the alley; that's why I ran. I ain't did nothing. I ain't got no gun; what [are] you detaining me for. . . . He needed to quit lying on me. He finded [sic] no gun on me. Why am I being detained? I ran and dumped my dope and came back. . . No gun, no motive. I ain't got no lie to tell. I dumped my dope. He stole my jewelry.

At that point, other officers found a gun in the defendant's line of sight, and the defendant said, "Man, ain't found no gun on me. Man, how do you know it was me; that could have been anybody's. Whose gun? I know my lawyer will get me off. I got money; I got big money. Take me down so I can make bond." The defendant also stated, "Man, he steals $4,000 worth of jewelry and I'm supposed to let it ride. F**k that s**t, man."

Metro Police Investigator David Elmore testified he searched the area and found a gun hidden inside a plastic bag of clothing in a pile of garbage across the street from the victim's residence.

Metro Police Officer Charles Ray "Friday" Blackwood testified he searched the victim's residence and was unable to find a weapon; he recovered three live .38 shells from James Barnes' pocket; and the .38 revolver found in the garbage had five spent casings in its chambers.

Medical Examiner Dr. Bruce Levy testified the victim died as a result of three gunshot wounds fired from a distance of "greater than 18 to 24 inches" from the victim's body. Although Dr. Levy stated the victim had small abrasions on his chin, arm, back, and abdomen, he opined they were not the result of a struggle.

Danny Morris, a specialist in latent fingerprint analysis with the Metro Police Identification Division, testified a palm print was recovered from the weapon that did not match the defendant's print. Morris explained, however, this evidence did not definitively establish that the defendant never handled the gun since there are numerous reasons why one could touch a surface and not leave a latent print.

Metro Police Detective Kent McAlister testified he searched the crime scene and was unable to find a gun or spent shell casings. Det. McAlister stated although the defendant and James Barnes were initially both suspects, the charges against James Barnes were dropped at his preliminary hearing. He explained James Barnes was not initially fingerprinted because his hand was bandaged, and after the charges were dropped, it became impossible to obtain his prints.

Metro Police Detective Jeff West testified he assisted in interviewing the defendant at the police station. He testified that although he could not recall if the defendant and James Barnes were seated together while awaiting questioning, it was unlikely because standard procedure dictates they be separated. Det. West testified the defendant confessed to the crime and told him to release James Barnes because he had "nothing to do with it" and had tried to stop him from going into the Martin residence with his gun.

TBI firearms expert Steve Scott testified the shell casings and bullet fragments submitted for analysis were fired from the .38 revolver. Scott conceded the gun was not tested for the presence of blood or tissue, and it was possible for a person's hand to become injured if caught between the weapon's hammer and firing pin.

The defendant testified when he got in the car with his father, James Barnes, on September 2nd, he did so with the intention of receiving a ride to visit his son. The defendant stated his father requested the defendant direct him to the defendant's drug supplier, a person by the name of "Ricko," which the defendant did. After their arrival, James Barnes asked Ricko the location of his stolen jewelry, and they drove to the victim's residence to replevy the jewelry. The defendant stated his father parked his vehicle on the street near the victim's residence, handed the defendant the revolver, and told the defendant to place it in his pocket. The defendant testified the gun remained in his shorts until he handed it back to James Barnes. He stated that, under the instruction of James Barnes, he gave Tommy Morrell drugs to summon the victim outside.

The defendant further testified he and James Barnes walked toward the residence, and the victim exited onto the porch. When the defendant inquired, "where [is] the jewelry," the victim ran back inside the home. The defendant stated he then stepped in the front room of the house, and the victim's mother told him to "get out;" he exited and ran around the side of the house, attempting entry through the back door; and since the door was locked, he returned to the front of the house where he handed James Barnes the gun. The defendant said he "[g]ave [James Barnes] the gun back [and] started out [of] the yard . . . thinking he's coming behind me . . . thinking it's over."

-4-

The defendant further stated once he arrived at the car, he realized his father had not followed him, so he reentered the residence, went to the rear of the home, and saw the victim run to the bathroom. He then attempted to open the bathroom door, which was either locked or being held, and as he started to leave the home again, James Barnes fired a shot through the bathroom door. After the shot was fired, the victim exited the bathroom and struggled for the gun with James Barnes. The defendant stated that after a brief struggle, James Barnes fired shots, handed the defendant the gun, and they exited the home. The defendant stated he then ran across the street and discarded his "eighty-ball" of "dope" and the gun. He stated that he ran back to the car because he thought he left his beeper in the car and then dove into the car.

The defendant stated he had no intention of killing the victim, and after he was arrested, he made admissions to Officer Locke because

> in [his] neighborhood, it's like, you try to make the polices as mad as you can by being as smooth as you can with them. You just smart off to them, just try to smart off to them, make them mad cause like -- that's all I was doing was really just mouthing off.

The defendant further testified he was seated next to his father at police headquarters, and his father intimidated him, so he confessed to the crime. The defendant explained he was fearful of his father, and his father had always said "the worst thing you can be is a snitch."

The defendant further testified he "probably" threatened to shoot the victim's mother, but did so to try to scare her out of the house so "no more innocent bystanders [would get] hurt;" he got blood on his shorts while attempting to protect the victim by trying to separate James Barnes from him; and James Barnes wiped the gun clean prior to giving it to him. The defendant further admitted he had contact with James Barnes while awaiting trial on bond, and he conceded he said he was on bond because of the person he killed, but explained it was just "everyday neighborhood talk."

Saunte Lewis Young, the defendant's sister, testified the defendant never owned jewelry; James Barnes wore jewelry; James Barnes had previously "cut" the defendant; and they had previously shot at each other. Sandra Barnes, the defendant's mother, testified the defendant and James Barnes had a bad relationship, but she had requested the defendant try to get along with him.

The jury convicted the defendant of premeditated first degree murder.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends the evidence was insufficient to sustain his conviction because the state failed to prove the defendant acted with "deliberat[ion]" as alleged in the indictment. We disagree.

## A. Standard of Review

When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a combination of direct and circumstantial evidence. State v. Brewer, 932 S.W.2d 1,18 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995).

The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence. *Id.* In State v. Grace, the Tennessee Supreme Court stated, "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d 474, 476 (Tenn. 1973).

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.

## B. Analysis

The indictment alleged the defendant "intentionally, *deliberately* and with premeditation" killed the victim. (Emphasis added). The defendant's claim of insufficiency of the evidence is based on the indictment's usage of the term "deliberately." The present first degree murder statute defines first degree murder as a "premeditated and intentional killing of another" and became effective July 1, 1995. *See* Tenn. Code Ann. § 39-13-202(a)(1) (1997). However, the indictment alleged deliberation -- an element required under the former premeditated first degree murder statute. *See* Tenn. Code Ann. § 39-13-202(a)(1) (1991); *see generally* State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000) (citations omitted). During the jury charge conference, the state erroneously conceded it bore the burden of proving deliberation since it was alleged in the indictment. *See* State v. Hopper,

695 S.W.2d 530, 535 (Tenn. 1985) (allegation in felony murder indictment of "deliberately" held to be surplusage which did not have to be proved).

Regardless, deliberation was sufficiently established. Deliberation "requires proof of a 'cool purpose' that includes some period of reflection during which the mind is free from passion and excitement." Carruthers, 35 S.W.3d at 558.

We view the evidence in a light most favorable to the state. The defendant got Tommy Morrell to summon the victim out of his home. The defendant then demanded return of his jewelry, brandished the murder weapon, and told the victim's mother "[y]our son stole my jewelry, and I'm going to kill him." The defendant entered the residence, was ordered out by the victim's mother, and exited upon her request. He then ran around the side of the house and attempted to gain entry through the back door, but since it was locked, returned to the front of the home and reentered the residence. The defendant threatened to kill the victim's mother if the victim would not stop hiding, and the victim was shot three times. The defendant attempted to hide the murder weapon and, when arrested, confessed to the crime. Although the defendant testified his father shot the victim and coerced him to confess to the crime, the jury was free to disbelieve him. *See* State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995).

Having reviewed the evidence in the light most favorable to the state, we conclude the evidence sufficiently established the defendant deliberately killed the victim. We further conclude the evidence sufficiently established that the killing was premeditated and intentional. This issue is without merit.

## II. CHOICE OF COUNSEL

The defendant contends he was denied the right to retain counsel of his choice. We disagree.

"The right to counsel includes the qualified right to the [retained] counsel of one's choice." State v. Parrott, 919 S.W.2d 60, 61 (Tenn. Crim. App. 1995). An indigent defendant's right to appointed counsel, however, "does not include the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel." Carruthers, 35 S.W.3d at 546.

Counsel had been appointed for the defendant based upon his affidavit of indigency. His first appointed counsel was allowed to withdraw because of her conflict with the defendant. New counsel was appointed. During a pretrial motion less than a week before the trial was scheduled to begin, counsel moved for a continuance. Counsel explained that due to the defendant's failure to maintain contact with her, she was unprepared for the scheduled trial date. The court announced, "[G]iven what you say about your client's irresponsibility in keeping track with his lawyer, his [present] bond

is set at $35,000, under these circumstances, . . . indicating his irresponsibility, the Court increases his bond to $85,000."

Defendant's counsel then announced that the defendant did not desire her continued representation. The defendant then stated, "Your Honor, can I file a motion, I don't want her on my case anymore; I don't want her on my case . . . I need a little time to get me another lawyer; I would have the money." After the prosecutor explained to the court the defendant's first appointed counsel had filed a motion to withdraw due to conflict with the defendant, the trial judge ordered the defendant taken into custody based on the new bond setting, and the trial court requested an in-chambers conference.[2] When court resumed, the trial judge reinstated the $35,000 bond and strongly admonished the defendant to keep in contact with his lawyer. The defendant agreed and thanked the judge.

After the defendant was convicted, different counsel represented the defendant. At the motion for new trial, the defendant testified that after the judge increased his bond and ordered him confined, trial counsel met with him within ten minutes and said, "I talked to the judge about your bond. He said you can get back on your bond if you keep me on your case." The defendant testified he "didn't want to go back to [the] Justice Center," so he said, "Cool." Although the defendant initially testified he had $5,000 for a retainer fee for private counsel, he conceded the charge for an attorney would actually have been a lump sum of $15,000, for which he was going to sell drugs to acquire.

Paula Blair, the defendant's appointed trial counsel, testified at the motion for new trial hearing she was unable to contact the defendant prior to the pretrial hearing and confronted him about this. Blair stated the defendant told her that he wanted another lawyer. Blair further testified she informed him they would speak with the judge about it; she attended an off-the-record discussion in chambers; and upon leaving chambers, she met with the defendant and told him his bond would remain at $35,000, he would be released, and he was granted a continuance. Blair stated the agreement did not require she remain as the defendant's counsel, and the defendant appeared "very happy."

Anthony Finley testified he was present in the holding area where the defendant met with his trial counsel. Finley testified he overheard trial counsel tell the defendant he would not be able to

---

[2]We again take this opportunity to discourage "off-the-record" discussions concerning matters of significance in criminal proceedings; otherwise, appropriate appellate review may be precluded. *See* Tenn. Code Ann. § 40-14-307(a) (requiring court reporter to "attend every stage of each criminal case"); *see also* State v. Hammons, 737 S.W.2d 549, 551 (Tenn. Crim. App. 1987) (condemning "off-the-record bench conferences"); State v. James Hall Schlegel, No. W2000-02597-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 77, at *14 (Tenn. Crim. App. Jan. 28, 2002, at Jackson) (condemning in-chambers charge conferences); State v. Blaine M. Wright, CCA No. 03C01-9401-CR-00388, 1995 Tenn. Crim. App. LEXIS 960, at *28 (Tenn. Crim. App. Dec. 11, 1995, at Knoxville), *perm. to app. denied* (Tenn. 1996) (noting the requirement to preserve for the record all bench conferences).

get back out on bond unless he kept her as his counsel. Finley conceded he was serving a sentence for aggravated sexual assault and had a prior armed robbery conviction.

At the conclusion of the hearing, the trial judge stated:

> I don't see any place in the transcript where I said that if he moved to have Ms. Blair withdraw, I would revoke his bond. I can say, and I hope it's clear from the transcript, my concern was that he was not keeping – he wasn't communicating with his lawyer. That led me to believe that he was not a good risk to appear, because he had acted irresponsibly, and I increased his bond because I was not confident that a $35,000 bond would get him where he needed to be, given what Ms. Blair had just told me. . . . The court doors were open. If he had hired other counsel . . . new counsel could certainly have made an appearance and then either tried to get ready for the July trial or moved otherwise. In no way did I or did I mean to indicate that his bond would be revoked if he tried to change a lawyer.

The evidence does not preponderate against the trial court's findings. Defendant was not deprived of his right to retain counsel of his choice.

## III. PROSECUTORIAL MISCONDUCT

The defendant contends the state committed prosecutorial misconduct by failing to *sua sponte* redact an inculpatory hearsay statement contained in an audio tape played to the jury even though defense counsel was afforded an opportunity to review the tape pretrial. We disagree.

The state played an audio tape recording of the defendant's detention in the cruiser which included a statement by an unknown officer indicating James Barnes said the defendant shot the victim. The trial court, *sua sponte*, alerted the parties to the hearsay statement. Defense counsel then moved for a mistrial. The trial court denied the motion for a mistrial and held that a curative instruction was an adequate remedy, noting, according to the defense's theory, James Barnes wrongfully accused the defendant of the shooting and coerced him to accept blame. The trial court then gave the jury an appropriate curative instruction.

"The test to be applied in reviewing a claim of prosecutorial misconduct is whether the improper conduct could have affected the verdict to the prejudice of the defendant." Brimmer v. State, 29 S.W.3d 497, 527 (Tenn. Crim. App. 1998) (citations omitted). Here, the defendant has failed to establish prosecutorial misconduct. Furthermore, a jury is presumed to follow curative instructions given by the trial court. State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994). The trial court's usage of a curative instruction was a proper remedy. In addition, we conclude the defendant suffered no prejudice. *See* Tenn. R. App. P. 36(b). This issue is without merit.

# IV. LESSER-INCLUDED OFFENSES

The trial court instructed the jury on the indicted offense of premeditated first degree murder and the lesser offenses of second degree murder and reckless homicide. The defendant contends the trial court's failure to instruct the jury on facilitation of premeditated first degree murder and voluntary manslaughter constituted error. We disagree.

## A. Waiver

Initially, we conclude this issue has been waived by the defendant. Our court has stated the following:

> We recognize that Tenn. Code Ann. § 40-18-110(a) [1997] requires a trial court to charge all lesser-included offenses even "without any request on the part of the defense to do so." Thus, the requirement to charge lesser-included offenses is not contingent upon a request by the defendant to do so. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001).

> Nevertheless, our appellate courts have consistently recognized that a party cannot take advantage of errors which he or she committed, invited or induced the trial court to commit. Adkins v. State, 911 S.W.2d 334, 346 (Tenn. Crim. App. 1994); State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993). In discussing the failure of a defendant to object to a mistrial, our supreme court stated:

>> Obviously, the rationale for requiring an objection to a mistake is that it gives the trial judge an opportunity to cure a situation that one or both parties perceive to be in error. A party ought not be permitted to stand silently by while the trial court commits an error in procedure, and then later rely on that error when it is to his advantage to do so. State v. Mounce, 859 S.W.2d 319, 323 (Tenn. 1993).

State v. Elesa D. McDaniels, No. E2000-02790-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 867, at *14-15 (Tenn. Crim. App. Nov. 1, 2001, at Knoxville). In McDaniels, we concluded that defense counsel's affirmative acquiescence in the failure to charge a lesser-included offense constituted a waiver of the error. Id. at *15-16. McDaniels has been cited with approval by this court in other cases. See Yasmond Fenderson v. State, No. E2001-01088-CCA-R3-PC, 2002 Tenn. Crim. App. LEXIS 402, at *16-17 (Tenn. Crim. App. May 2, 2002, at Knoxville); State v. Drini D. Xhaferi, No. M2000-01758-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 174, at *7 (Tenn. Crim. App. Mar. 7,

2002, at Nashville); <u>State v. James Hall Schlegel</u>, No. W2000-02597-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 77, at *16-17 (Tenn. Crim. App. Jan. 28, 2002, at Jackson).

Our supreme court has held that a trial court may charge an applicable lesser-included offense even though the defendant <u>objects</u> to the charge. <u>State v. Bolden</u>, 979 S.W.2d 587, 593 (Tenn. 1998). Nevertheless, we see nothing in <u>Bolden</u> that approves a defendant affirmatively <u>agreeing</u> to a charge on lesser-included offenses and then taking a totally inconsistent position after the conviction when it is to his advantage to do so. *See* <u>Drini D. Xhafer</u>, 2002 Tenn. Crim. App. LEXIS 174, at *7; *see generally* <u>Mounce</u>, 859 S.W.2d at 323.

We now examine what transpired in the trial court. The trial court discussed the proposed jury charge with counsel prior to final argument. The trial court indicated its intent to charge first degree murder, second degree murder and reckless homicide. The following exchange then occurred:

> THE COURT: Okay. Now, [defense counsel], what do you say about these lesser-included offenses?
>
> [DEFENSE COUNSEL]: I see reckless homicide, Your Honor, but I don't see voluntary manslaughter, and the facts that [the prosecutor] presented to support voluntary manslaughter, I don't remember those -- that specific story. I believe she said that Mr. Barnes said in his statement, he shot through the door, the victim came out, and he shot him in the leg and then a struggle ensued. I thought that it was the other way around.
>
> THE COURT: So you're satisfied with First, Second and Reckless?
>
> [DEFENSE COUNSEL]: Yes, sir.

Thus, defense counsel expressly agreed to the charge on lesser-included offenses, and we assume, although final argument is not in the record, tailored her argument accordingly. Furthermore, there is no indication that there was any objection to the jury charge. The issue was first raised in the motion for new trial when defendant had different counsel.

As in <u>McDaniels</u>, defendant affirmatively acquiesced in the failure to charge facilitation of first degree murder and voluntary manslaughter and took a totally inconsistent position in the motion for new trial and in this appeal. Relief is not available to a party who is responsible for, or fails to take action to prevent, an error. Tenn. R. App. P. 36(a). We, therefore, consider this issue waived. In the event further appellate review concludes otherwise, we now address the issue on the merits.

## B. Duty to Instruct on Lessers

The trial court has a duty to instruct the jury on any lesser-included offenses of the charged offense when such instruction is supported by the evidence, regardless of whether the defendant has requested such an instruction. State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999). The standard for an appellate court's review of the trial court's charge to the jury regarding lesser-included offenses is *de novo* with no presumption of correctness. Bowles, 52 S.W.3d at 74.

If an offense is found to be a lesser-included offense, the court must next ascertain whether the evidence justifies a jury instruction on the lesser-included offense. *Id*. at 75. To do so, the court must first determine whether there is evidence that "reasonable minds" could accept to establish the lesser-included offense. Burns, 6 S.W.3d at 469. The court must view the evidence liberally in a light most favorable to the existence of the lesser-included offense without judging its credibility. State v. Ely, 48 S.W.3d 710, 722 (Tenn. 2001); Burns, 6 S.W.3d at 469. Finally, the court must determine if the evidence is "legally sufficient" to support a conviction for the lesser-included offense. Burns, 6 S.W.3d at 469.

The evidence, not the theories of the parties, determines whether an instruction on a lesser-included offense should be given. State v. Allen, 69 S.W.3d 181, 188 (Tenn. 2002). Furthermore, the decision to convict on a lesser-included offense should not be taken from the jury simply because the element distinguishing the greater offense from the lesser offense is "uncontroverted." *Id*. at 189. If the evidence justifies an instruction, the failure to charge the offense is error even though the evidence was also sufficient to support the greater offense. Burns, 6 S.W.3d at 472.

## C. Voluntary Manslaughter

Voluntary manslaughter, a Class C felony, "is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Voluntary manslaughter is a lesser-included offense of premeditated first degree murder. State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998).

It is questionable whether a charge on voluntary manslaughter was justified in light of the evidence presented at trial. Nevertheless, in the event the trial court erred by not charging voluntary manslaughter, it was clearly harmless beyond a reasonable doubt. Harmless error may be shown where the jury convicts on the highest offense charged to the exclusion of the immediately lesser offense, thereby rejecting other lesser offenses. *Id*. Here the trial court charged premeditated first degree murder, second degree murder and reckless homicide. By finding the defendant guilty of first degree murder and rejecting second degree murder, the jury would have rejected voluntary manslaughter. *See id*. (holding a guilty verdict on first degree murder and rejection of second degree murder renders the failure to charge voluntary manslaughter harmless beyond a reasonable doubt). Thus, if the trial court erred in failing to charge voluntary manslaughter, it was harmless beyond a reasonable doubt.

**D. Facilitation of First Degree Murder**

"A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a). Facilitation of first degree murder is a Class A felony. *See* Tenn. Code Ann. § § 39-11-117(a)(1), -403(b). Facilitation of first degree murder is a lesser-included offense of premeditated first degree murder. Burns, 6 S.W.3d at 470.

This court has held:

> Before an accused can be convicted of the facilitation of a felony, the state must prove beyond a reasonable doubt that the accused (a) knew another person was going to commit a specified felony and (b) knowingly furnished substantial assistance in the commission of the felony although the accused did not possess the requisite intent to be guilty of the felony.

State v. Parker, 932 S.W.2d 935, 950-51 (Tenn. Crim. App. 1996).

In order for reasonable minds to find the defendant guilty of facilitation of premeditated first degree murder, the jury would have to conclude in this case that the defendant, although not acting with the intent to promote premeditated murder nor benefit in the results, gave this father the pistol or otherwise furnished substantial assistance to his father "knowing that [his father] inten[ded] to commit [premeditated first degree murder]." *See* Tenn. Code Ann. § 39-11-403(a). This was not the state's theory nor was it the defense theory; however, the evidence, not the theories of the parties, controls whether a lesser-included offense should be charged. Allen, 69 S.W.3d at 188. In Allen, the court concluded the failure to charge facilitation of robbery was error, even though the use of a deadly weapon was uncontroverted, since it was controverted whether the accomplice defendant shared the intent of his principal. *Id.*

We are required to view the evidence in a light most favorable to the existence of the lesser-included offense without judging credibility. Ely, 48 S.W.2d at 722. Although it is indeed a close question, we believe that reasonable minds could have found the defendant guilty of facilitation of premeditated first degree murder. We further believe the evidence was legally sufficient to support such a conviction. Nevertheless, this does not end our inquiry.

Having concluded a jury charge on facilitation of first degree murder was justified, we now examine whether the failure to charge it was harmless error. Harmless error relating to the failure to charge lesser-included offenses must be shown "beyond a reasonable doubt." Ely, 48 S.W.3d at 727. Harmless error may be shown where the jury convicts on the highest offense to the exclusion of the immediately lesser offense, necessarily rejecting other lesser offenses. Williams, 977 S.W.2d at 106. However, harmless error is not limited to the Williams rejection of an intermediate lesser offense; the proper inquiry is "whether it appears beyond a reasonable doubt that the error did not

affect the outcome of the trial." Allen, 69 S.W.3d at 191. In making the harmless error determination, this court must "conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." *Id*.

We first examine the evidence at trial. The state's proof established the following. The defendant entered the victim's home brandishing the murder weapon, demanded his jewelry, and told the victim's mother he intended to kill the victim. The defendant went around to the back of the residence seeking the victim and, not being able to unlock the back door, reentered through the front door. He threatened to kill the victim's mother. The victim was shot three times at close range; the defendant discarded the weapon outside; and the defendant confessed to the crime at the police station, stating his father had "nothing to do with it." It was not the state's theory that the defendant was criminally responsible for the conduct of his father, nor was criminal responsibility even charged to the jury. The state never waivered from its theory that the defendant was the triggerman.

The defendant testified he gave his father the pistol prior to the shooting, "thinking it's over," and thinking his father was following him to the car. The defendant did not indicate he knew his father intended to commit premeditated murder. It was the defense theory the defendant was not the triggerman and did not know his father intended to kill the victim. His testimony was inconsistent with facilitation to commit premeditated first degree murder. Such a charge was never requested.

The jury's verdict reflects it flatly rejected defendant's testimony and theory of defense and fully accredited the state's theory that the defendant was the triggerman. Facilitation to commit premeditated first degree murder is a Class A felony as is second degree murder; therefore, the Williams harmless error scenario is inapplicable because there was no intermediate lesser-included offense. Nevertheless, unlike Allen where the jury passed over the greater offense in favor of a lesser offense and the court did not find harmless error, *see* Allen, 69 S.W.3d at 189, the jury in this case did not pass over the greater charge of premeditated first degree murder in favor of second degree murder.

Considering the evidence at trial, the defendant's theory of defense, and the verdict rendered by the jury, we conclude the failure to instruct on facilitation to commit premeditated first degree murder was harmless beyond a reasonable doubt and did not affect the outcome of the trial.


**CONCLUSION**

Based on the evidence, we affirm and conclude: (1) the evidence was sufficient to sustain the conviction; (2) the defendant was not deprived of the opportunity to secure retained counsel of his choice; (3) the defendant has failed to establish prosecutorial misconduct; and (4) the trial court's failure to charge facilitation of first degree murder and voluntary manslaughter as lesser-included offenses was waived as an appellate issue and, further, was harmless beyond a reasonable doubt.

-14-

_____
JOE G. RILEY, JUDGE